Joshua **REYNOLDS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–10–00977–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

May 24, 2012.

Eric J. Davis, Davis & Associates, PLLC, Houston, TX, for Appellant.

Jessica A. Caird, Assistant District Attorney, Patricia R. Lykos, Harris County District Attorney, Houston, TX, for State.

Panel consists of Justices KEYES, BLAND, and SHARP.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Joshua Reynolds, of the second degree felony offense of aggravated assault, assessed punishment at five years' confinement, and recommended that the trial court place him on community supervision.[1] The trial court suspended appellant's sentence and placed him on community supervision for five years. In three issues, appellant contends that the trial court erred when it (1) denied him the right to cross-examine the complainant regarding a potential bias against him; (2) refused to give a self-defense instruction in the written charge pursuant to Penal Code section 9.04; and (3) allowed victim-impact testimony during the guilt-innocence phase of trial.

We affirm.

## Background

On April 17, 2010, the complainant, Jessica Paulin, and several of her neighbors and friends held a barbecue party in front of their houses. Jessica testified that, after midnight, she was walking out of her neighbor's house when she saw a car turn onto her street "at a high speed," narrowly missing several children who were playing in the grassy median of the street. According to Jessica, the driver of the car, who was later identified as Ryan Gonzalez, had his window rolled down and he was yelling and cursing at the children. Jessica yelled back at Gonzalez, "You don't need to be talking to the kids like that. Those are just kids." After Gonzalez sped away, Jessica told Rich Segali, one of the guests at the party, about the incident. She asked Segali if, when the car drove by again, he would mind stopping the car and telling the driver to slow down because of the children. Segali agreed to do so.

When the car approached again "a couple of minutes" later, Segali was standing in the middle of the road. Jessica heard Segali, who seemed "concerned" and "kind of angry," tell Gonzalez to slow down because of the children in the area. She stated that, as Segali was speaking to Gonzalez, he had his hands on the driver's side window and was leaning into the car. According to her, Segali was "firm," but he did not make any verbal or physical threats to Gonzalez, and Gonzalez was

---

1. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (Vernon 2011).

"very passive [and] apologetic." Jessica testified that a few of the men from the party walked over to the car, and one of them, Luis Arjona, told the group that he knew Gonzalez and that everything was "okay." After Luis joined the group, Gonzalez got out of his car and the men stood around the car and calmly talked. Jessica briefly spoke to her husband, Troy Paulin, who assured her that "[e]verything's going to be fine," but as she turned to walk back into her house, she saw appellant "walking fast" toward her with a gun.

Jessica testified that she froze and said, "What are you doing, Josh? Why do you have the gun? Put the gun down." As he walked toward her, appellant pointed the gun at Jessica's head. Appellant stopped "just a couple of inches" from Jessica, and continued pointing the gun at her for "[m]aybe 10[or] 15 seconds." Appellant appeared angry and asked, "Why are you f— with my boy?" Appellant "clicked" his gun, and Jessica started running to her house and screamed, "He's got a gun; get the kids inside." Jessica did not see if appellant pointed the gun at anyone else.

On cross-examination, Jessica testified that Josh Oldham, another friend who attended the party, stood in the street with Segali to stop Gonzalez, and she agreed with defense counsel that Oldham "is a pretty large man." She again stated that Segali was "firm" with Gonzalez, and she testified that Gonzalez "cooperated 100 percent," got out of his car, and shook hands with Segali. She testified that, after Luis arrived at the car, the men were being "very friendly."

During cross-examination of Jessica, defense counsel asked, "Even before this [incident] happened, you would have been happy to see Josh's family move out of the neighborhood, correct?" The State objected on relevance grounds, and the parties had the following exchange with the trial court:

[Defense]: Goes to bias or motive.

. . . .

The Court: Not sure where you're going.

[Defense]: Well, the bias is that she's lying because she hates [appellant's] mom. And that's what I'm getting at.

[State]: I don't think it's relevant as to self-defense.

The Court: Yeah, I don't know if the fact she doesn't like his mom shows bias.

[Defense]: It shows bias against him, you know, kind of to get at the mom by making sure he gets in some kind of criminal trouble.

The Court: I don't know that I can make that leap. Where does that come from?

[Defense]: Well, I know that she has bias because when I talked to her on the phone, she complains about [appellant's] mom, says she's a piece of work or a work of art and a deadbeat mom and goes on about some other stuff. Clearly she doesn't like the lady and has—

The Court: But that's not who's on trial; so, I'm going to sustain [the State's] objection.

The trial court did not allow defense counsel to question Jessica regarding her feelings toward appellant's mother.

Segali testified that he was "upset" when Jessica told him about the car speeding around the corner. He stated that he walked out into the street with Jessica to stop the car when it drove past again and perhaps three or four of the other men attending the party followed. Segali characterized his demeanor while standing in the street and holding up his hand as "aggressive," and he clarified that he ex-

hibited "the intent that [he] wanted [the car] to stop." Segali told Gonzalez in a "raised" voice, "What ... is your problem[?] There [are] kids out here." He stated that Gonzalez was "kind of just startled," but he was also apologetic. He testified that the "mood" of the group of people standing around Gonzalez's car was "just fine," and that everyone was standing around listening to Segali's conversation with Gonzalez. Segali testified that he spoke with Gonzalez for about three to five minutes before he heard someone yell, "He's got a gun." Segali turned around and saw appellant pointing a gun at Jessica, and appellant then "switched the gun from Jessica to [Segali] and then cocked it." Segali stated that he was standing approximately two feet away from Gonzalez's car when appellant arrived with the gun and that appellant stood three or four feet away from him and Jessica when he pointed the gun.

Segali testified that he began to yell at appellant when he saw the gun, and he told him, "Why [are] you bringing a gun out here? Nothing [is] going on. There is no reason to bring a gun." He stated that appellant did not look scared and that appellant replied, in response to Segali's questions, that "he was there to protect his friend." He did not recall verbally or physically threatening appellant. He testified that when appellant arrived he was "still yelling" at Gonzalez about his speed and his use of obscenities around the children, but he was not threatening Gonzalez in any way. To Segali's knowledge, no one at this party had any kind of weapon, no one physically or verbally threatened Gonzalez, no one banged on or tried to overturn his car, and no one touched Gonzalez.

On cross-examination, Segali acknowledged that, at the time of this incident, he was holding an empty cup, but he did not recall throwing this cup at Gonzalez's car.

He also agreed with defense counsel that he yelled at Gonzalez and that a few other adults were walking around Gonzalez's car during this incident. He further agreed that, after appellant arrived, he had to be physically pulled from the scene by his wife and son.

Julie Oldham, another guest at the party, testified that after the men stopped Gonzalez's car, she heard yelling, although she did not know who was doing the yelling. She recalled that Luis arrived and told everyone that he knew the driver and that everything was "cool," and that Gonzalez was apologetic. She stated that approximately six people were standing by Gonzalez's car and that no one had any weapons or anything that could be used as a weapon, such as a beer bottle. Julie testified that the situation was "calm," and then she heard someone scream, "He's got a gun." She looked over and saw appellant walk right past her, carrying a gun. Julie heard appellant cock the gun, and she saw him stand "right next to" Jessica and point the gun at her head. Julie did not see appellant point the gun at anyone else because she ran off to take the children inside.

Troy Paulin testified that he did not become involved in the incident until after Segali had already stopped Gonzalez's car. As he walked over, he heard someone say, "He's apologizing; everything's cool. He knows that he shouldn't have been speeding through here." Troy told Jessica, "Everything's good," and he started to walk away, but he then heard Jessica say, "He's got a gun." Troy ran back over to the car, saw appellant, who was pointing the gun at Segali, and said, "Josh, you don't want to do this." Troy was ultimately able to disarm appellant. At this point, he heard appellant say, "There's one in the chamber," which Troy understood to mean that the gun was loaded and ready to fire.

The prosecutor asked Troy, "What was going through your mind when you saw [appellant] hold the gun to Rich?" Defense counsel objected on relevance grounds, and the trial court overruled the objection. Troy responded,

> I couldn't believe I was at a location where there was an actual gun. My first thought was, Where [are] my kids, where's my wife. All I could think about were stories, okay, people got shot here, people got shot there. I thought if I was going to do anything, I needed to react quickly, just in case it did turn out to be something worse than it was.

Troy testified that no one else present had a weapon and that he never saw anyone throw anything at Gonzalez's car, pound on the car, or make any kind of threats to Gonzalez or appellant.

Josh Oldham testified similarly to the other party attendees. He agreed that the group did not surround Gonzalez's car and that, upon being stopped by Segali, Gonzalez "was just very forthcoming that he was very, very sorry." He testified that, when appellant arrived with the gun, he was saying, "What the F are y'all doing? ... You F with him, you F with me. You get away from my friend ...." Oldham testified that he and the others attempted to reassure appellant that the situation was under control, that they "just wanted to know what was going on," and that there was no reason to bring a gun. He further stated that Gonzalez then got out of his car and told appellant to put away his gun. According to Oldham, when appellant arrived, no one was yelling at or threatening Gonzalez.

Luis Arjona testified on behalf of appellant and stated that, after Gonzalez stopped, Segali "chunked" his cup at the windshield of Gonzalez's car. He testified that it "looked like [Segali] was about to yank [Gonzalez] out of the car" before Luis recognized Gonzalez as appellant's friend. At this point, Segali "backed off" and Luis spoke with Gonzalez. Luis testified that people were "surrounding" the car and that they were all "upset." He also stated that Gonzalez was apologetic and "very remorseful," and that he "finally realized the gravity of the situation and he apologized to everyone." After Gonzalez apologized and the group was about to walk away from the car, Luis heard a click and someone say, "He's got a gun." Luis saw appellant with a gun, but he never saw appellant point the gun at anyone's head.

Ryan Gonzalez testified that, as he turned onto appellant's street to drop him off at his house, several kids were in the street. He yelled at them to "get the F out of the way." He dropped appellant off and drove back down the street, but he started to slow down when he saw a few men approach his car. Gonzalez stopped completely when one of the men threw a drink at the car. Gonzalez testified that he was "kind of scared" as he rolled down his window. He stated that he apologized after the men explained why they were upset. He further testified that, as he was talking to Luis, no one was touching him or his car. Gonzalez was about to go home when he "heard some commotion in the background," saw appellant, and "heard something about a gun." He testified that he never saw appellant holding a gun.

On cross-examination, Gonzalez testified that he wanted to apologize to appellant's neighbors and that he "wanted to make it clear to them [that he does] come though that neighborhood a lot and [he] would want them to respect [him] as [he] would respect them." He reiterated that he never saw appellant holding a gun, but he also testified that when he learned about the gun he was surprised that appellant had brought it to the scene. He agreed with

the State that no one else present had any weapons.

Appellant testified on his own behalf. He stated that Gonzalez dropped him off at his house, and he began to walk to his front door as Gonzalez made a U-turn to go back down the street. As he reached his front door, he heard "the brakes clamp" and Gonzalez's car stop. Appellant testified that he walked back toward the street and saw a large man "running with his hands up in the air in front of [Gonzalez's] car, saying, 'Do you have a problem? Get out of the car.'" He stated that he could clearly hear what was being yelled from his house, "about five houses" down from where Gonzalez had stopped. He saw a man approach Gonzalez's driver's side door, throw something at the car, and begin to grab at the driver's side door. He testified that he heard the man scream at Gonzalez to get out of the car, and he ran into his house.

Appellant testified that he believed that the men were going to yank Gonzalez out of his car and "beat him up right there." He thought about calling the police, but he decided against this course of action because he only had a cell phone and "[i]t takes a really long time to call police on a cell phone." Appellant, who had been at a shooting range with Gonzalez earlier in the evening, decided to get the pistol that he had used at the range from his backpack. He stated that his gun was not loaded, because he had used all of the ammunition at the shooting range, so he grabbed five or six bullets and began loading the gun as he ran back down the street. He stated that he took the gun because he "thought it was the only way [he] could get [the group] away from Ryan." When asked why he brought the bullets as well, appellant responded,

> You just never know. I really thought that they were going to be beating him

by then and these are big guys and a lot of guys, not just one but three or four guys, and as I approached, the car's surrounded by a bunch more guys.

When appellant left his house, he could see a group of people surrounding Gonzalez's car, and he could not see what was happening. He believed that Gonzalez was on the ground at this point, and he believed that Gonzalez was in danger.

Appellant testified that, when he arrived at the car, he saw two men leaning into the driver's side window and Gonzalez was crying. He stated that they were screaming at Gonzalez, but they were not physically contacting him. Appellant had the following exchange with defense counsel:

Q: What was your hope? In taking the gun down there, what was your hope of accomplishing?

A: Just getting them away from [Gonzalez] so I could call the police to stop what was happening.

Q: That, in other words, it would scare them to leave?

A: Scare them to leave and I could do something.

Q: As you neared the car, did you make any decision that you were going to shoot anybody?

A: No, sir.

He further testified that, as soon as Troy and Luis approached him and told him that there was no reason to bring a gun, he "instantly was calm and understood that." He denied ever being close enough to point the gun at Jessica. Appellant testified that he never intended to shoot anyone and that he did not try to shoot anyone.

On cross-examination, appellant agreed with the State that the gun was not loaded when he grabbed it from his bedroom and that he "made the conscious decision to load that gun." He testified that the type

of gun that he displayed during the incident required him to individually load the bullets into the magazine. He stated that he loaded the magazine as he was running to the scene. He testified that, as he approached the car, he said, "Get away from the car. What are y'all doing to him?" He admitted that he "racked the gun in order to load . . . a live bullet into the chamber." He agreed with the prosecutor that Gonzalez appeared surprised when he got out of his car and saw appellant holding the gun. He further agreed that, although his intent was only to show the gun to scare the others, he loaded it because he realized that he might have to use it "[o]nly if something that bad was happening."

At the charge conference, defense counsel requested that the trial court submit the following jury instruction:

> The threat of force is justified when the use of force is justified. A threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the defendant's purpose is limited to creating an apprehension that he will use deadly force, if necessary, does not constitute the use of deadly force.

This instruction tracks the language of Penal Code section 9.04. *See* TEX. PENAL CODE ANN. § 9.04 (Vernon 2011). The trial court denied the request for this instruction, reasoning that this language "is basically contained within the self-defense charge." The trial court included in the charge instructions on self-defense, defense of others, and apparent danger.

The jury ultimately found appellant guilty of the offense of aggravated assault, assessed punishment at five years' confinement, and recommended that the trial court place appellant on community supervision. The trial court sentenced appellant to five years' confinement and suspended the sentence. This appeal followed.

## Limitation of Cross–Examination

■■■ In his first issue, appellant contends that the trial court abused its discretion when it refused to allow defense counsel to cross-examine Jessica Paulin regarding her alleged dislike of appellant's mother, which would have revealed her bias against appellant.[2]

■■■ We review a trial court's decision to exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex.Crim.App.2010). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App.2008). A trial court does not abuse its discretion if any evidence supports its decision. *See Osbourn v. State*, 92 S.W.3d 531, 538 (Tex.Crim. App.2002). We will uphold the trial

---

**2.** To the extent appellant contends that the trial court's failure to allow cross-examination on this topic violates the Confrontation Clause, we hold that appellant failed to preserve this complaint for appellate review. When an objection to evidence is lodged, "it is not enough to tell the judge that [the] evidence is admissible. The proponent, if he is the losing party on appeal, must have told the judge *why* the evidence was admissible." *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim.App.2005) (emphasis added). Here, the State objected to this line of questioning on relevance grounds, and defense counsel explained that the questioning "[g]oes to bias or motive" on the part of Jessica Paulin against appellant. Defense counsel did not, however, argue that this questioning was necessary to satisfy the mandates of the Confrontation Clause. *See id.* at 179 ("When a defendant's objection encompasses complaints under both the Texas Rules of Evidence and the Confrontation Clause, the objection is not sufficiently specific to preserve error.") (citing *Cantu v. State*, 939 S.W.2d 627, 634 (Tex.Crim.App. 1997)).

court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz v. State,* 279 S.W.3d 336, 344 (Tex.Crim.App.2009).

The Sixth Amendment right to confront witnesses "includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying." *Hammer v. State,* 296 S.W.3d 555, 561 (Tex.Crim.App.2009). Generally, the Texas Rules of Evidence permit a defendant to "cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition." *Id.* at 563; *see also* Tex.R. Evid. 613(b) (providing for impeachment of witness by evidence of alleged bias or interest in favor or against party); *Billodeau v. State,* 277 S.W.3d 34, 42 (Tex.Crim.App. 2009) ("The possible animus, motive, or ill will of a prosecution witness who testified against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him."); *Carpenter v. State,* 979 S.W.2d 633, 634 (Tex.Crim.App. 1998) ("Exposing a witness' motivation to testify for or against the accused or the State is a proper and important purpose of cross-examination."). The scope of permissible cross-examination is "necessarily broad." *Carroll v. State,* 916 S.W.2d 494, 497 (Tex.Crim.App.1996). "A defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias or interest for the witness to testify." *Id.*

This broad scope of cross-examination does not mean, however, "that a defendant can explore every possible line of inquiry." *Smith v. State,* 352 S.W.3d 55, 64 (Tex.App.-Fort Worth 2011, no pet.).

"[T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or *only marginally relevant.*" *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (emphasis added); *see also Hammer,* 296 S.W.3d at 561 ("This right is not unqualified, however; the trial judge has wide discretion in limiting the scope and extent of cross-examination."). Thus, the proponent of evidence that allegedly establishes bias must show that the evidence is relevant by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's potential motive to testify in favor of the other party. *Woods v. State,* 152 S.W.3d 105, 111 (Tex.Crim. App.2004). The trial court does not abuse its discretion in excluding evidence of the alleged bias if the proponent of the evidence does not establish the required nexus. *Smith,* 352 S.W.3d at 64.

Here, defense counsel asked Jessica Paulin, the complainant, about whether, even before this particular incident occurred, she would have been happy to see appellant's family move from the neighborhood. The State objected on relevancy grounds, and defense counsel argued that the evidence "goes to bias or motive." When asked to explain, defense counsel stated that, "[T]he bias is that she's lying because she hates [appellant's] mom." Defense counsel also argued that, "It shows bias against [appellant], you know, kind of to get at the mom by making sure [appellant] gets in some kind of criminal trouble." When the trial court responded, "I don't know that I can make that leap," defense counsel stated that he had spoken with Jessica, and, during this conversation, "she complain[ed] about [appellant's] mom,

[said] she's a piece of work or a work of art and a deadbeat mom and [went] on about some other stuff. Clearly she doesn't like the lady. . . ." The trial court stated, "But that's not who's on trial," and it sustained the State's objection.

On appeal, appellant provided no further reasoning for why evidence that Jessica allegedly dislikes appellant's mother provided a motivation for Jessica to testify against appellant and to give false testimony regarding his actions during the incident. It does not logically follow from Jessica's dislike of appellant's mother that she necessarily dislikes, or has some animus against, appellant as well and wants to see him in "criminal trouble" and, therefore, had a motive to lie under oath about the facts of the incident. As the State notes, Jessica's alleged comments to defense counsel in a prior telephone conversation that appellant's mother is a "piece of work" and a "deadbeat mom" could "demonstrate a concern for [appellant] that he lacked proper parenting," not that she was biased against him and had a motivation to falsify her testimony.

As the proponent of the evidence allegedly demonstrating bias or motive, appellant bore the burden to establish a nexus or logical connection between Jessica's testimony and her potential motive to testify against him. *See Woods,* 152 S.W.3d at 111; *Smith,* 352 S.W.3d at 67 ("As the proponent of the evidence concerning Moss's alleged bias or motive, Appellant had the burden to demonstrate a nexus or logical connection between the separate checking account and Moss's alleged plan to divorce him and her potential motive to testify against him."). The trial court expressly found that no such logical connection existed between Jessica's alleged dislike of appellant's mother and her motive to testify against appellant and give false testimony. *See Smith,* 352 S.W.3d at 68

("Whether Moss had a separate checking account was only a marginally relevant issue and does not necessarily indicate that she had a reason to provide false testimony."). We defer to the trial court's discretion to determine that appellant failed to establish the logical nexus required to demonstrate bias. We hold that the trial court did not abuse its discretion in refusing to allow defense counsel to pursue this line of questioning.

We overrule appellant's first issue.

### Entitlement to Section 9.04 Instruction

In his second issue, appellant contends that the trial court erred in refusing to submit a requested jury instruction pursuant to Penal Code section 9.04, relating to self-defense.

■■■■ We use a two-step process in reviewing jury charge error. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App.2005). First, we determine whether error exists in the charge. *Id.* If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id.* When the defendant properly objected to the error in the charge, reversal is required unless the error was harmless. *Id.; see also Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim. App.1984); *Starks v. State,* 127 S.W.3d 127, 133 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd, untimely filed) (providing that, to preserve error in jury charge, defendant must object or request specific charge).

■■■■ When a defensive theory is raised by the evidence from any source, the theory must be submitted to the jury. *See Brown v. State,* 955 S.W.2d 276, 279 (Tex.Crim.App.1997). If the defense is supported by the evidence, the defendant is entitled to an instruction on that defense, regardless of whether the support-

ing evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court is of the opinion that the testimony is not credible. *See Shaw v. State,* 243 S.W.3d 647, 658 (Tex.Crim.App. 2007); *see also Walters v. State,* 247 S.W.3d 204, 209 (Tex.Crim.App.2007) (holding same). We review a trial court's decision not to include an instruction on a defensive issue in the charge for an abuse of discretion, and we view the evidence in the light most favorable to the defendant's requested submission. *See Bufkin v. State,* 207 S.W.3d 779, 782 (Tex.Crim.App. 2006); *Love v. State,* 199 S.W.3d 447, 455 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd).

Penal Code section 9.04 provides:

The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

TEX. PENAL CODE ANN. § 9.04 (Vernon 2011). Defense counsel requested an instruction that tracked the language of this section. The trial court refused to include this instruction in the charge, reasoning that this language "is basically contained within the self-defense charge."

Here, appellant testified that he did not intend to shoot anyone and that he brought the gun with him in the hope that he could scare the group surrounding the car and get them away from Gonzalez. He also testified that he brought the gun with him to confront the group because he "thought it was the only way [he] could get [the group] away from Ryan." He stated that when he brought the gun, he hoped to "[s]care [the group] to leave. . . ." We conclude that the record contains some evidence that appellant's purpose in threatening to use deadly force was "limited to creating an apprehension that he will use deadly force if necessary." *See id.* Thus, because some evidence supports this defensive issue, we hold that appellant was entitled to a section 9.04 instruction. *See Brown,* 955 S.W.2d at 279 (holding that defensive theory must be submitted to jury when theory is raised by evidence from any source); *see also Shaw,* 243 S.W.3d at 658 (holding that defendant entitled to instruction on defensive theory regardless of whether evidence supporting theory is weak or contradicted, or when trial court believes supporting evidence is not credible); *Bufkin,* 207 S.W.3d at 782 (holding that we view evidence in light most favorable to defendant's requested submission).

Because we have determined that the trial court erroneously failed to submit appellant's requested section 9.04 instruction, we must now determine whether this failure caused some harm to appellant. *See Ngo,* 175 S.W.3d at 743 (holding that, when defendant properly objects to charge error, reversal required unless error was harmless). "To determine if there is any harm, the degree of harm must be weighed in light of the entire jury charge, state of the evidence, counsels' arguments, and any other relevant information revealed by the trial record as a whole." *Starks,* 127 S.W.3d at 133 (citing *Almanza,* 686 S.W.2d at 171).

On appeal, appellant argues, "The jury essentially had no choice but to convict appellant after he admitted to pointing the gun with the crowd of people around him, despite appellant's testimony that he was trying to scare people away from assaulting his friend, did not fire the gun, and did not intend to shoot anyone." Appellant ignores the fact that the trial court included in the charge instructions and applica-

tion paragraphs regarding self-defense, defense of others, and apparent danger. For example, the trial court instructed the jury as follows:

Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force, or to protect a third person if, under the circumstances as he reasonably believed them to be, such person would be justified in using force or deadly force to protect himself against the unlawful force or deadly force of another which he reasonably believed to be threatening the third person he seeks to protect, provided he also reasonably believes that his intervention is immediately necessary to protect the third person. The use of force against another is not justified in response to verbal provocation alone.

The trial court also instructed the jury that:

When a person, or the third person, is attacked with unlawful deadly force, or he reasonably believes he, or the third person, is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury to himself or the third person, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself or the third person from such attack or attempted attack. And it is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and

person, or the life and person of the third person, from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from this standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself, or the third person, against the other person's use or attempted use of unlawful deadly force.

The trial court included the following application paragraphs in the charge:

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, Joshua Reynolds, did threaten Jessica Paulin or others with imminent bodily injury by using or exhibiting a deadly weapon, namely, a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both of Jessica Paulin or others it reasonably appeared to the defendant that his life or person, or the life or person of Ryan Gonzalez, was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury to himself or Ryan Gonzalez from the use of unlawful deadly force at the hands of Jessica Paulin or others, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself or Ryan Gonzalez against Jessica Paulin's or others' use or attempted use of unlawful deadly force, he threatened Jessica Paulin or others with a firearm, then you should acquit the defendant on the grounds of self-defense or defense of a third person; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense or in defense of Ryan Gonzalez on said occasion and under the

circumstances, then you should give the defendant the benefit of that doubt and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that he or Ryan Gonzalez was in danger of death or serious bodily injury, or that the defendant, under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself or Ryan Gonzalez against Jessica Paulin's or others' use or attempted use of unlawful deadly force, then you should find against the defendant on the issue of self-defense and on the issue of defense of a third person.

Even though the trial court did not include a separate section 9.04 instruction in the charge, the language included in the charge did not leave the jury with "no choice but to convict."

Section 9.04 states that "[t]he threat of force is justified when the use of force is justified by this chapter." TEX. PENAL CODE ANN. § 9.04. Sections 9.31 and 9.33, which set out the defenses of self-defense and defense of a third person, respectively, provide two instances in which the use of force is justified. *See id.* §§ 9.31, 9.33 (Vernon 2011). The trial court included instructions concerning both of these defenses in the charge. The jury was therefore instructed that if it found that the use of force was justified under the facts of this case, either because appellant acted in self-defense or in defense of Gonzalez, it should acquit appellant. By finding appellant guilty of aggravated assault, the jury implicitly determined that the use of force was not justified under these factual circumstances. *See Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991) ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory."). Thus, because the jury implicitly found that the *use* of force was not justified, any finding that the *threat* of force was justified in this case would be immaterial. *See* TEX. PENAL CODE ANN. § 9.04.

Both defense counsel and the State addressed the issue of self-defense during closing arguments, with defense counsel pointing out the general rationale behind this defense and urging the jury to look at the situation from appellant's perspective. The State acknowledged that the jury had to consider the issue of self-defense, but it pointed out that appellant intentionally and individually loaded multiple bullets into the gun, that Gonzalez was never threatened nor did he ever feel threatened, that Gonzalez was surprised by appellant's presence and surprised to hear that appellant had a gun with him, that appellant had never had any problems with his neighbors before, that all of the party attendees and Gonzalez testified that the situation had calmed down and was under control by the time appellant arrived, and that appellant had drawn his gun and pointed it at the group before he even reached the scene. The State argued that no reasonable person in this situation would act the way that appellant did.

The jury was properly instructed on the defensive issues of self-defense, defense of others, and apparent danger, and it was instructed to find appellant not guilty if it believed his testimony relevant to these issues. If the jury believed that appellant's behavior was reasonable and justified under the law and the facts of this case, based on the language of the charge as given, it could have found appellant not guilty. The jury, however, implicitly rejected appellant's contention that he justifiably acted in self-defense or in defense of Gonzalez when he displayed the gun to the group and pointed it at Jessica Paulin, and

appellant does not challenge the sufficiency of the evidence supporting this determination. Based on the language of the entire jury charge, the state of the evidence, and the arguments of counsel, we therefore conclude that, under the facts of this case, the trial court's failure to include the requested section 9.04 instruction was harmless. *See Starks*, 127 S.W.3d at 133 ("To determine if there is any harm, the degree of harm must be weighed in light of the entire jury charge, state of the evidence, counsels' arguments, and any other relevant information revealed by the trial record as a whole.").

We overrule appellant's second issue.

### Admission of Victim–Impact Testimony

■ Finally, in his third issue, appellant contends that the trial court erroneously admitted victim-impact testimony during the guilt-innocence phase of the trial when it allowed the State to ask Troy Paulin what went through his mind when he saw appellant point the gun at Rich Segali.

■ The Court of Criminal Appeals has drawn a distinction between victim *character* evidence and victim *impact* evidence, which is most commonly an issue in murder cases:

The former is designed to give the jury 'a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being.' The latter is designed to remind the jury that murder has foreseeable consequences to the community and the victim's survivors—family members and friends who also suffer harm from murderous conduct.

*Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim.App.2002) (quoting *Payne v. Tennessee*, 501 U.S. 808, 830–31, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991) (O'Connor, J., concurring)); *Williams v. State*, 176

S.W.3d 476, 483 (Tex.App.-Houston [1st Dist.] 2004, no pet.). "Victim-impact" evidence, therefore, is evidence concerning the effect of the crime after the crime occurs. *See Hayden v. State*, 296 S.W.3d 549, 553 (Tex.Crim.App.2009) ("Victim 'impact' evidence is evidence of the effect the victim's death has on other people."); *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim.App.2005) ("Victim-impact evidence is evidence concerning the effect the victim's death will have on others, particularly the victim's family members . . . .").

■ Victim-related evidence "may be admissible at the *punishment phase* when that evidence has some bearing on the defendant's personal responsibility or moral culpability." *Espinosa v. State*, 194 S.W.3d 703, 711 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (emphasis added); *see also Ford v. State*, 919 S.W.2d 107, 115–16 (Tex.Crim.App.1996) (allowing victim impact evidence in capital murder case when jury was required to answer special issue asking about defendant's "personal moral culpability" and, thus, defendant's moral blameworthiness and culpability was relevant issue at punishment); *Love*, 199 S.W.3d at 456–57 ("Victim impact testimony is irrelevant at the guilt-innocence phase of a trial because it does not tend to make more or less probable the existence of any fact of consequence with respect to guilt or innocence.").

■ To preserve a complaint regarding the erroneous admission of victim-impact evidence for appellate review, the defendant must object on the ground that the evidence constitutes impermissible victim-impact evidence. *See Karnes v. State*, 127 S.W.3d 184, 195 (Tex.App.-Fort Worth 2003, pet. ref'd) (holding that objection to testimony at trial on grounds that testimony was "irrelevant, highly prejudicial, and below the threshold requirement of admissibility" does not preserve appellate challenge that testimony constitutes inadmissi-

ble victim-impact testimony); *see also Pena v. State,* 285 S.W.3d 459, 464 (Tex. Crim.App.2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.") (citing *Reyna v. State,* 168 S.W.3d 173, 177 (Tex. Crim.App.2005)).

Here, the State asked Troy Paulin, "What was going through your mind when you saw [appellant] hold the gun to Rich?" In response to the State's question regarding what was going through his mind when he saw appellant point a gun at Rich Segali, Troy testified as follows:

> I couldn't believe I was at a location where there was an actual gun. My first thought was, Where [are] my kids, where's my wife. All I could think about were stories, okay, people got shot here, people got shot there. I thought that if I was going to do anything, I needed to react quickly, just in case it did turn out to be something worse than it was.

As in *Karnes,* defense counsel objected solely on relevance grounds; he did not argue that any testimony responsive to this question would constitute impermissible victim-impact evidence. *See Karnes,* 127 S.W.3d at 195. Thus, as in *Karnes,* defense counsel's relevancy objection at trial did not preserve his appellate complaint that the testimony constitutes inadmissible victim-impact testimony "because the objection at trial does not comport with the complaint raised on appeal." *See id.; see also Pena,* 285 S.W.3d at 464 (noting that preservation depends on whether complaint on appeal comports with complaint made at trial); *Reyna,* 168 S.W.3d at 177 ("The issue ... '[is] whether the complaining party on appeal brought to the trial court's attention the very complaint that party is now making on appeal.'") (quoting *Martinez v. State,* 91 S.W.3d 331, 336 (Tex.Crim.App.2002)).

Furthermore, even if appellant had properly preserved his complaint that Troy's testimony was inadmissible victim-impact evidence introduced during the guilt-innocence phase of the trial, the testimony at issue does not constitute victim-impact testimony. Indeed, this testimony does not fall into either category of victim-related evidence. Troy testified regarding his thoughts *at the time of the incident;* he did not testify regarding the effect that the crime had had on his life or how the incident had affected him and his family. *See Mathis v. State,* 67 S.W.3d 918, 928 (Tex.Crim.App.2002) ("[T]he testimony in the present case did not involve testimony about how third persons were affected by the crime, nor was there any discussion about the character of the victim."); *see also Hayden,* 296 S.W.3d at 553 (characterizing, in murder case, victim-impact evidence as "evidence of the effect the victim's death has on other people"); *Espinosa,* 194 S.W.3d at 711 ("Relevant victim impact evidence may include the physical, psychological, or economic effects of a crime on the victim or the victim's family.").

We therefore conclude that, even if appellant had preserved his complaint for appellate review, Troy Paulin's testimony does not constitute inadmissible victim-impact evidence. Thus, we hold that the trial court did not abuse its discretion in permitting this testimony.

We overrule appellant's third issue.

### Conclusion

We affirm the judgment of the trial court.

Justice SHARP, dissenting.