**Opinion issued April 30, 2020**



In The

# Court of Appeals

### For The

# First District of Texas

_____

## NO. 01-18-01134-CR

_____

## ROBERT THOMAS BUFORD, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 12th District Court**
**Grimes County, Texas**
**Trial Court Case No. 18256**

## O P I N I O N

A jury convicted appellant, Robert Thomas Buford, of murder and assessed his punishment at 30 years' imprisonment.[1] In two issues on appeal, Buford argues that (1) the trial court erred in denying his request to include additional language in

---

[1]    *See* TEX. PENAL CODE § 19.02(b)(1).

the jury charge's instructions on self-defense; and (2) the trial court erred in excluding Buford's expert witness, Augustin Gutierrez, Jr.

Because we conclude that the trial court adequately charged the jury on the issue of self-defense and that Gutierrez's opinions were not relevant to the issues before the jury, we affirm.

### Background

In February 2017, Buford was living with the complainant, Janet Lester, and they had had a tumultuous 17-year relationship. Buford, who was 6'4'' and weighed approximately 245 pounds, was a heavy drinker. Lester, who was 5'0'' and weighed less that 80 pounds, used marijuana. They were both in their mid-70s. Lester's best friend, Claudia Greenhouse, described Lester and Buford's relationship as "snipey," stating that "[t]hey were always kind of saying little side comments back and forth." She further stated that Lester "was not happy" when Buford was intoxicated, which was "[j]ust about every time [she'd] ever seen [him]." When he had been drinking, Buford was "[b]elligerent, cruel sometimes. But he laughed a lot, joked a lot, but some of the things he would consider joking I would take as cruel." Lester also would "gripe, complain quite a bit," especially about Buford's drinking.

Greenhouse testified that she observed physical conflict between them twice, stating Buford would "bump" into Lester when he was intoxicated and because of

her "tiny" size, "it would knock her into a chair." Lester would "push him back and he might push her back." Greenhouse had never seen them strike each other. In the last year, Greenhouse noticed that Lester was increasingly unhappy: "She didn't laugh as much. She was a little bit more withdrawn. Her stress level was higher. She wouldn't eat as much. She was upset a lot more." Buford remained the same as he had been, but he was "[a] bit more antagonistic. The words that [they] said to each other were meaner, crueler." He also became increasingly "paranoid" about Lester and "would accuse her of seeing other people or stealing things."

Debbie Sweet, Lester's sister, likewise testified that Lester did not like to be at home because Buford was "always very verbally abusive and he was always drunk, always." When he was drunk, he "was very obnoxious" and "called [Lester] names." She would argue back with him. Sweet observed only verbal arguments between Lester and Buford.

Buford's sister, Frankie Milley, also testified regarding the relationship between Buford and Lester. She testified that Buford was not violent, but he drank daily. She testified that he was not mean when he was drunk; he was "silly" and wanted to "reminisce about childhood." Milley testified that Buford's relationship with Lester "wasn't nice." Lester was "always just putting [Buford] down" and "never had anything nice to say about him, ever." On occasion, Lester would call Milley while she was fighting with Buford. Milley testified that Lester would

3

scream and cuss, that she made threats, such as stating, "I'm going to take a baseball bat to his head and kill him." Milley stated that these comments "really frightened" her because she "really thought [Lester] would do something to him." Milley testified that she would tell Lester that she "just need[ed] to leave" if she was so unhappy. Lester told her, "I'll kill his ass before I end up giving him a dime out of this house."

On February 10, 2017, Buford began the day by purchasing alcohol and drinking with a friend. Sometime around 4:00 p.m., Lester informed her friend and her sister that Buford had returned home and was drunk. Buford and Lester eventually had an altercation, and Buford shot Lester, killing her.

At trial, conflicting evidence was presented regarding the altercation that occurred at the time of the shooting. The State presented evidence that after she was shot, Lester called 9-1-1 and told the dispatcher, "He shot me," before becoming unresponsive. Sergeant B. Baldobino was dispatched to the scene and activated his body camera. The video was admitted at trial, along with his testimony. When he arrived at Buford and Lester's home, Sergeant Baldobino saw Lester on the front porch with a bullet wound and in "obvious medical distress." He saw Buford lying on the floor inside the house. He asked Buford what had happened, and Buford stated, "I shot her." Sergeant Baldobino secured the scene and found the firearm in a bedroom. Sergeant Baldobino then returned to Buford,

4

noting that he was still on the floor, with an icepack, napkins, a set of dentures, and "what appeared to be a spent projectile" on the floor next to him. He also saw that Buford had a head wound, which he described as "a goose egg on his forehead" with a "small abrasion," but the injury did not appear to be life threatening. Keeping his eye on Buford, Sergeant Baldobino returned to the porch to check on Lester, who was no longer breathing and had lost a lot of blood. At this time, other law enforcement personnel arrived, including Constable B. Jarvis.

Buford refused medical treatment from the emergency medical personnel. He needed help getting from the floor to a nearby chair and was "being very uncooperative with medical personnel and all officer personnel." Sergeant Baldobino stated that "there was a heavy odor of alcoholic beverage emitting from [Buford's] person," and he believed Buford was "under the influence of alcohol."

Buford made several statements to officers at the scene, prior to being taken into custody. Sergeant Baldobino testified that Buford appeared "disoriented and very uncooperative with the questions initially." Buford told Constable Jarvis that he had shot Lester. Buford told Constable Jarvis that there had never been any physical altercations in his relationship with Lester, but they did not get along well and would have verbal altercations and "cussed each other." Regarding the circumstances of the shooting, Buford did not mention being struck or kicked by Lester. Buford did not tell Constable Jarvis that Lester had threatened to kill him.

5

Buford told Constable Jarvis that he "drank something in the house" and became "immobile" to the point that he fell on the floor and was crawling because he could not get up. Buford stated that he hit his head on the table, then "wound up crawling to his bedroom to retrieve a gun." Buford told Jarvis that, as he crawled, Lester "was riding his ass" and "was on him about being on the floor," so he turned around and shot her while she was standing in the doorway. Subsequent ballistic testing established that Buford shot Lester from below, consistent with him being on the ground and her standing. Ballistic testing also established that Lester had to have been standing at least three feet away from Buford when he shot her.

Buford also spoke with his sister, Milley, while he was being held in jail. Recordings of those conversations were admitted into evidence, and Milley testified about them as well. Buford told her that his injuries were sustained when he fell multiple times and that his head injury specifically was the result of a fall. He told Milley that Lester was berating him for not being able to get off the floor and that she was standing in the doorway at the time he shot her. Buford told her that he tripped on a rug and hit his head on the door jam. Buford also told Milley that he got the gun out of the drawer in his bedroom to scare Lester.

Buford presented evidence that Lester abused marijuana. Her doctor reported that, in the weeks leading up to the shooting, she had complained about feeling jittery, having night sweats, and experiencing "rage," possibly as a side

6

effect of medications she was taking to treat medical conditions, including emphysema. Buford himself testified that his relationship with Lester was difficult and that she was frequently angry. He testified that he never physically laid a hand on her, but they would fight verbally. Lester would get mad "real easy" and "accuse [him] of things that [he] didn't do." He testified that "[i]t's always something different" and "[t]here was no winning." He described "verbal abuse":

> She would start out kind of mildly with—with semi attitude and then it would get worse and worse and worse and her face expressions, she'd get up in my face and it looked like she was ready to hurt me some kind of way. And I just—it was no use of standing there. I'd just have to go. You know, it was a lot of no-win situation with her.

Buford testified that when she would yell at him, he would leave the house and go for a drive in his truck or walk around the yard.

In his trial testimony, Buford admitted shooting Lester, and he testified that, at the time of the shooting, Lester began cussing at him and then left the room. Buford stated that he fell due to medical issues. He testified that when he fell and could not get up, he was "hurt" and "embarrassed" that he could not get up to leave and get away from Lester's cussing like he usually did. As he was trying to get himself off the floor and onto his bed, he felt a blow to the left side of his head, ended up back on the floor, and noticed Lester at the door of his bedroom. Buford testified that Lester kicked him, cursed and screamed at him, and told him, "I ought

7

to kill your ass." He warned her to leave him alone, but she did not stop. He cocked his pistol, and eventually shot her because he feared for his life.

Buford sought to present the testimony of Augustin Gutierrez, Jr., a licensed professional counselor, as an expert on victims of domestic violence. The trial court ruled, however, that Gutierrez's testimony was not relevant and excluded it.

The trial court ultimately submitted an instruction on self-defense to the jury. Buford wanted additional language to address "apparent danger," arguing that the jury needed to be instructed that he was entitled to use deadly force when and to the degree necessary to prevent what he perceived as Lester's attempt to murder him. The trial court included standard instructions on self-defense, reasonable belief, and deadly force, but it overruled Buford's request for any additional language in the charge.

The jury found against Buford on the issue of self-defense and convicted him of murder. This appeal followed.

## Charge Error

In his first issue, Buford argues that the trial court erred in rejecting his request to include additional language regarding the right to use deadly force and apparent danger in the jury charge.

## A.    Standard of Review

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *see Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (courts use two-step process to review alleged jury-charge error). In our review of a jury charge, we first determine whether error occurred; if not, our analysis ends. *Kirsch*, 357 S.W.3d at 649. If error occurred, whether it was preserved then determines the degree of harm required for reversal. *Id.* When, as here, the defendant has properly objected to the error in the charge, reversal is required unless the error was harmless. *Ngo*, 175 S.W.3d at 743.

Trial courts must "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018). When a defensive theory is raised by the evidence, the theory must be submitted to the jury. *Reynolds v. State*, 371 S.W.3d 511, 521 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (citing *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997)). A defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that each element is true. *Id.* at 521–22; *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE § 2.03(c)

9

("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense.").

We review a trial court's decision not to include an instruction on a defensive issue in the charge for an abuse of discretion, and we view the evidence in the light most favorable to the defendant's requested submission. *Reynolds*, 371 S.W.3d at 522 (citing *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006), and *Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)).

## B.     Relevant Facts

The charge stated, in relevant part,

You have heard evidence that, when [Buford] . . . committed an act clearly dangerous to human life with intent to cause serious bodily injury to an individual, namely, Janet Lester, by shooting Janet Lester with a firearm, he believed his use of force was necessary to defend himself against Janet Lester's use or attempted use of unlawful deadly force.

**Relevant Statutes**

A person's use of deadly force against another that would otherwise constitute the crime of murder is not a criminal offense if the person reasonably believed the force used was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.

Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant.

The charge defined "reasonable belief" as "a belief that an ordinary and prudent person would have held in the same circumstances as the defendant." It defined "deadly force" as "force that is intended or known by the person using it to cause death or serious bodily injury or force that in the manner of its use or intended use is capable of causing death or serious bodily injury."

The charge also instructed the jury regarding an applicable presumption:

Under certain circumstances, the law creates a presumption that the defendant's belief that the force he used was immediately necessary—was reasonable. A presumption is a conclusion the law requires you to reach if certain other facts exist.

Therefore, you must find the defendant's belief—that the force he used was immediately necessary—was reasonable unless you find the state has proved, beyond a reasonable doubt, at least one of the following elements. The elements are that—

1. the defendant neither knew nor had reason to believe that Janet Lester—

a. was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery; or · ·

2. the defendant provoked Janet Lester.

If you find the state has proved element 1 or 2 listed above, the presumption does not apply, and you are not required to find that the defendant's belief was reasonable.

Whether or not the presumption applies, the state must prove, beyond a reasonable doubt, that self-defense does not apply to this case.

11

Buford requested additional language to be added to this self-defense instruction. He argued that the charge was missing language from Penal Code section 9.32(a)(2)(B), which provides that a person is justified in using deadly force to the degree immediately necessary "to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *See* TEX. PENAL CODE § 9.32(a)(2)(B). Buford argued that this language was "part of the presumption, but it's also part of the right to self-defense."

The trial court questioned, "Is that not unlawful deadly force, murder?"

Buford:  It can be. But they're going to probably say that the force that was used against him was not unlawful deadly force. . . . That's why I need this instruction that he's trying to prevent—he's trying to use it to prevent himself from dying. . . .

Court:  I mean, if it were aggravated kidnapping, sexual assault, aggravated sexual assault, a robbery or aggravated robbery would be the allegation of the issue raised under 3, but the only one potentially would be murder, which is unlawful deadly force.

The objection is overruled. It will be denied. All right.

Buford then read into the record the instruction he sought to add to the charge:

When a person is attacked with unlawful deadly force where he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such a person . . . a reasonable expectation of fear of death or serious bodily

injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary be it from his standpoint at the time to protect himself from such attack or attempted attack.

It is not necessary that there be an actual attack or attempted attack as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time. . . .

In determining the existence of real or apparent danger, you should consider all the facts and circumstances in evidence before you. . . .

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant . . . did as alleged, or you further find from the evidence as viewed from the standpoint of the defendant at the time from the words or conduct of. . . Janet Lester, . . . [o]r if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under said circumstances, then you should give the defendant the benefit of doubt and say by your verdict not guilty. . . .

## C. Analysis

Buford complains that the trial court erred in refusing to add the requested additional language regarding apparent danger. He cites *Hamel v. State*, 916 S.W.2d 491 (Tex. Crim. App. 1996) in support of his opinion. In *Hamel*, the Court of Criminal Appeals recognized that a self-defense instruction is appropriate when a defendant reasonably, but incorrectly, perceives danger, stating, "A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real." *Id.* at 493. The *Hamel* court held that the appellant in that

case was entitled to a self-defense instruction because the evidence raised the issue of self-defense. *See id.* at 494.

Hamel does not support Buford's claim here. As in *Hamel*, Buford received a self-defense instruction. The instruction given by the trial court properly instructed the jury on self-defense, stating that Buford's use of deadly force against Lester was not a criminal offense "if [he] reasonably believed the force used was immediately necessary to protect [him] against [Lester's] use or attempted use of unlawful deadly force." *See* TEX. PENAL CODE § 9.31(a) (providing that person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force"); *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018). The trial court's jury charge also correctly defined reasonable belief as "a belief that an ordinary and prudent person would have held in the same circumstances as the defendant." *See* TEX. PENAL CODE § 1.07(a)(42) (defining reasonable belief as one "that would be held by an ordinary and prudent man in the same circumstances as the actor"). Thus, the jury charge as submitted instructed the jurors on all the law appliable to the case. *See Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case.").

Buford, argues, however, that he ought to have received a separate instruction on "apparent danger." The Fort Worth Court of Appeals addressed a similar issue several years ago, stating:

> Texas courts have held that when a defendant claims self-defense, his rights are fully preserved (and the concept of "apparent danger" is properly presented) when a jury charge (1) states that a defendant's conduct is justified if he reasonably believed that the deceased was using or attempting to use unlawful deadly force against the defendant, and (2) correctly defines "reasonable belief."

*Bundy v. State*, 280 S.W.3d 425, 430 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing *Valentine v. State*, 587 S.W.2d 399, 400–01 (Tex. Crim. App. [Panel Op.] 1979)); *see also Lowe v. State*, 211 S.W.3d 821, 824–25 (Tex. App.—Texarkana 2006, pet. ref'd) (stating that requirements also apply to cases not involving death of the victim).

As set out above, the trial court instructed the jury that Buford was justified in using force against another when and to the degree he reasonably believed the force was immediately necessary to protect him against Lester's use or attempted use of unlawful force. The charge thus properly instructed the jury as to the first requirement. *See Valentine*, 587 S.W.2d at 400–01; *Bundy*, 280 S.W.3d at 430. The trial court also properly defined "reasonable belief," satisfying the second requirement. *See Valentine*, 587 S.W.2d at 401; *Bundy*, 280 S.W.3d at 430. Thus, the instruction as given properly allowed the jury to consider all the circumstances facing Buford in determining the reasonableness of his belief that the use of deadly

force was necessary under the circumstances he faced, including his apparent danger from Lester's alleged conduct. The trial court did not err in refusing to submit Buford's additional charge language in jury charge.

We overrule Buford's first issue.

## Expert Witness

In his second issue, Buford complains that the trial court erred in excluding the expert testimony of Gutierrez.

### A. Standard of Review

We review the trial court's determination as to the admissibility of expert testimony for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). For expert testimony to be admissible, its proponent must demonstrate by clear and convincing evidence that the testimony is sufficiently reliable and relevant to help the jury reach accurate results. *See* Tex. R. Evid. 702; *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (citing *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)). There are three requirements for the admission of expert testimony: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will assist the factfinder in deciding the case. *Rhomer*, 569 S.W.3d at 669. These requirements are commonly referred to as (1) qualification,

16

(2) reliability, and (3) relevance. *Id.*; *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010).

A trial court's ruling on the admissibility of expert testimony will rarely be disturbed on appeal: "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006).

## B.    Relevant Facts

Buford sought to present the testimony of Augustin Gutierrez, Jr., a licensed professional counselor, as an expert on victims of domestic violence. At a hearing outside the presence of the jury, Buford presented Gutierrez's qualifications. Buford intended for Gutierrez to testify to the abuser-victim dynamic, the cycle of abuse, the impact of substance abuse on domestic violence, and reactions of abuse victims in the context of Buford's relationship with Lester. Buford expected that Gutierrez would testify "from Ms. Lester's point of view, the dynamic of an alleged abuser, of the control factor and meeting certain hypothetical facts." Buford stated that Gutierrez would testify that some of Lester's behavior was "part of the control process, that's part of the abuse process and it's exacerbated possibly by this prolonged drug use of marijuana." Gutierrez would also address Lester's

17

"self admission of suffering rage [as] a very important aspect of her abuse leading up to [the day of the shooting] where she allegedly struck Mr. Buford."

On cross-examination, Gutierrez testified that he had not questioned or had any interaction with Lester's family. He was not aware that there was some testimony that Buford had been controlling of Lester or that he would harass Lester when she left their home. Gutierrez was likewise unaware that Buford would engage in verbal abuse toward Lester. Gutierrez knew Buford was an alcoholic, but he was unaware that Buford's blood alcohol content on the day of the shooting was 2.07. He stated that this information would change his opinion as an expert, but "it would be hard for me to tell you to what degree because, again, I do not have all that information." The following conversation between the State and Gutierrez occurred:

State:      So can you tell us how you can provide testimony that would be relevant in this particular case?

Gutierrez:  I was asked . . . [to] shed light into the dynamic of domestic violence and substance abuse based on the information that I was given by the defense counsel.

State:      [B]ased on the information that I had given you [about Buford's conduct toward Lester], would you consider [Buford] to be a victim of abuse or would he be a perpetrator?

Gutierrez:  It could—there is a strong possibility [that he was both the perpetrator and a victim].

Gutierrez testified that he never spoke with Buford, that he was given information from defense counsel, and that he was not provided with details regarding some of the underlying information. For example, he was told about "an incident in which the sheriff or some law enforcement came to the home and [Lester] was asked to leave, by law enforcement," but he was not given an offense report or any other underlying facts of the situation.

The trial court asked what Gutierrez's specific opinions would be with regard to this case, and Buford responded that Gutierrez's opinions would address Buford's demeanor and statements to officers at the scene of the shooting and his responses to Lester's death. The trial court asked, "And what is the correlation between that and this case and the defense?" Buford testified that it went to the "apparent danger" and "the mindset of the defendant" that tied in with his defense of self-defense.

The State objected to Gutierrez's testimony, distinguishing this case from others in which courts ruled that expert opinions on domestic violence was admissible:

> In this case, there [is] absolutely no evidence from the defendant or from any witness that there has ever been any kind of violent episode. I will let the Court know that we—given this particular information, we feel it's now relevant to, on rebuttal, offer—introduce evidence of an extraneous offense related to [Buford] to show his intent in this particular case, where [Buford] had a gun on the table in the—in the dining room area and followed [Lester] around the house with the gun in the presence of another victim.

19

So if there is any evidence of abuse in this particular case, Your Honor, it is the defendant as perpetrator, not as a victim.

We do not believe that, first off, Mr. Gutierrez is qualified to testify as an expert in the area of domestic violence, as his practice is mainly focused on sexual abuse and substance abuse.

Second of all, we do not believe that his testimony would aid a trier in fact in this particular case in any way, shape or form.

Buford responded that Gutierrez's testimony was relevant to apparent danger and self-defense because "his reaction of self-defense is based upon his—what he appreciated at the time" and was "crucial" to his defense.

The trial court found that domestic violence is a recognized field of study and that Gutierrez was qualified to educate the jurors on the characteristics of domestic violence. The trial court also found, however, that "the opinions that are given by the witness in this particular case are not relevant to the issues that are raised in this case, and those opinions will not be helpful to the jurors in reaching a decision in this case" because he did not offer any "opinions concerning apparent danger and fear." The trial court excluded Gutierrez from testifying.

## C.    Analysis

The trial court ruled that Gutierrez was qualified as an expert, and it acknowledged that expert testimony on the issue of domestic violence may be admissible under some circumstances. *See, e.g.*, *Fielder v. State*, 756 S.W.2d 309, 315–16, 319–21 (Tex. Crim. App. 1988) (expert testimony concern dynamics of domestic violence were admissible to "rehabilitate" impeached defendant claiming

self-defense); *Dixon v. State*, 244 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (police officer trained and experienced in family violence permitted to testify as expert on behavior of victims of family violence); *Brewer v. State*, 370 S.W.3d 471, 472–74 (Tex. App.—Amarillo 2012, no pet.) (allowing expert testimony to explain delay in reporting abuse).

The trial court found, however, that Gutierrez's opinions were "not relevant to the issues that [were] raised in this case, and those opinions [would] not be helpful to the jurors in reaching a decision in this case." This finding is supported by the record and does not constitute an abuse of discretion by the trial court. *See Rhomer*, 569 S.W.3d at 669; *Rodgers*, 205 S.W.3d at 527–28.

"Relevant evidence is generally admissible, irrelevant evidence is not." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing TEX. R. EVID. 402). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "A 'fact of consequence' includes either an elemental fact or an evidentiary fact from which an elemental fact can be inferred." *Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016).

In the context of expert testimony, "[t]he relevance inquiry is whether evidence 'will assist the trier of fact' and is sufficiently tied to the facts of the

case." *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). "Hence, to be relevant, the expert 'must make an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony.'" *Id.*

Here, nothing in the record demonstrated that there was a history of domestic violence between Buford and Lester. Many witnesses testified that the parties engaged in verbal disagreements, but there was no evidence of physical conflict between the parties prior to the day of the shooting aside from Buford bumping into Lester while he was drunk. Buford testified that Lester directed verbal abuse toward him, but he also testified that he was able to leave the house or take a drive in his truck when she did so. The evidence suggested that Buford also directed verbal abused toward Lester. Gutierrez was not aware of the underlying facts involving the mutual verbal altercations and had not spoken with Buford or with anyone who had first-hand knowledge of Buford and Lester's relationship.

Thus, the record establishes facts from which the trial court properly exercised its discretion in excluding Gutierrez's testimony under the general rules of relevancy. *See Cox v. State*, 843 S.W.2d 750, 754 (Tex. App.—El Paso 1992, pet. ref'd) (excluding expert testimony on "battered spouse syndrome" under general relevancy rules). None of Gutierrez's expert opinions could have tied pertinent facts of the case to the principles of the cycle of abuse or abuser-victim

22

dynamics between Lester and Buford in a way that would have assisted the jury in reaching a verdict. *See Tillman*, 354 S.W.3d at 438. And, as the trial court observed, nothing about Gutierrez's opinions would have been able to address whether Buford's perception of apparent danger and fear of Lester was reasonable under the circumstances, because Gutierrez himself testified that he was not aware of the underlying circumstances and that he had only generalized knowledge based on hypothetical facts.

Buford was required to prove by clear and convincing evidence that Gutierrez's testimony was relevant to helping the jury reach accurate results. *See* TEX. R. EVID. 702; *Wolfe*, 509 S.W.3d at 335. He failed to meet this standard.

We overrule Buford's second issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

Publish. TEX. R. APP. P. 47.2(b).

23