PD-1039-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/11/2015 3:54:30 PM
Accepted 3/12/2015 9:11:00 AM
ABEL ACOSTA
CLERK

# PD-1039-14

# Court of Criminal Appeals of Texas

*Jose Guadalupe Rodriguez Elizondo,*
*Appellant*

*v.*

*State of Texas,*
*Appellee*

ON APPEAL FROM CAUSE NO. 13-12-00028-CR IN THE THIRTEENTH COURT OF
APPEALS
TRIAL COURT CAUSE NO. CR-3485-10-I
398TH JUDICIAL DISTRICT COURT OF HIDALGO COUNTY, TEXAS
HON. AIDA SALINAS FLORES/HON. LINDA YAÑEZ PRESIDING

## APPELLANT JOSE GUADALUPE RODRIGUEZ ELIZONDO'S
## AMENDED PETITION FOR DISCRETIONARY REVIEW

**ORAL ARGUMENT REQUESTED**

Brandy Wingate Voss
State Bar No. 24037046
SMITH LAW GROUP, P.C.
820 E. Hackberry Ave.
McAllen, TX 78501
(956) 683-6330
(956) 225-0406 (fax)
*Counsel for Appellant Jose
Guadalupe Rodriguez Elizondo*

# IDENTITY OF JUDGE, PARTIES, AND COUNSEL

**Trial Court Judges**                      Hon. Aida Salinas Flores
                                            Hon. Linda Yañez sitting by assignment

**Appellant**                               **Appellate Counsel**

Jose Guadalupe Rodriguez Elizondo           Brandy Wingate Voss
                                            Smith Law Group, P.C.
                                            820 E. Hackberry Ave.
                                            McAllen, Texas 78501

                                            **Trial Counsel**

                                            Santos Maldonado, Jr.
                                            209 E. University Dr.
                                            Edinburg, Texas 78539

**Appellee**                                **Trial Counsel**

State of Texas                              Rolando Cantu
                                            Criselda Rincon-Flores
                                            Hidalgo County District Attorney's
                                            Office
                                            Asst. Criminal District Attorneys
                                            100 N. Closner
                                            Edinburg, Texas 78539

                                            **Appellate Counsel**

                                            Ted Hake
                                            Michael Morris
                                            Hidalgo County District Attorney's
                                            Office
                                            Assistant District Attorneys—Appeals
                                            Division
                                            100 N Closner Rm 303
                                            Edinburg, TX 78539

i

# TABLE OF CONTENTS

IDENTITY OF JUDGE, PARTIES, AND COUNSEL................................................i

TABLE OF CONTENTS ...................................................................................ii

INDEX OF AUTHORITIES.............................................................................iv

STATEMENT REGARDING ORAL ARGUMENT...................................vi

STATEMENT OF THE CASE .........................................................................vi

STATEMENT OF PROCEDURAL HISTORY.........................................viii

GROUNDS FOR REVIEW...............................................................................ix

ARGUMENT.........................................................................................................1

I.     Fleeing to a vehicle nearly 70 yards away from an initial
       altercation should be sufficient abandonment and not a mere
       change of position. ...................................................................................1

II.    The court of appeals should have analyzed all the elements
       of *Smith v. State* before determining that Elizondo
       provoked the second altercation. ...........................................................3

III.   The court of appeals affirmed on a jury charge that was
       grossly incorrect by ignoring and then misapplying this Court's precedent. ....8

       A.    The court of appeals erroneously refused to review two
             omissions from the charge, in conflict with this Court's
             prior decisions...............................................................................9

       B.    The court of appeals erroneously failed to properly apply
             the appropriate harm analysis to the other charge errors .....................11

C.      The jury charge was a garbled mess, and a review of the
        complete charge and application of the proper harm
        analyses requires reversal. ........................................................................15

CONCLUSION AND PRAYER...........................................................................19

CERTIFICATE OF COMPLIANCE WITH RULE 9.4(e) .......................................20

CERTIFICATE OF SERVICE.............................................................................21

APPENDIX .....................................................................................................22

# INDEX OF AUTHORITIES

**Cases**

*Barrera v. State,*
    982 S.W.2d 415 (Tex. Crim. App. 1998).......................................................... 10, 11

*Brown v. State,*
    651 S.W.2d 782 (Tex. Crim. App. 1983)...................................................17

*Carlile v. State,*
    255 S.W. 990 (Tex. Crim. App. 1923). ....................................................2

*Cornet v. State,*
    417 S.W.3d 446 (Tex. Crim. App. 2013)..................................................14

*Elizondo v. State,*
    No. 13-12-00028-CR, 2014 WL222834 (Tex. App.–Corpus Christi
    Jan. 16, 2014, pet. filed) (mem. op., not designated for publication)..............passim

*Ervin v. State,*
    367 S.W.2d 680 (Tex. Crim. App. 1963) ...................................................2

*Frank v. State,*
    688 S.W.2d 863 (Tex. Crim. App. 1985) ..................................................10

*Gray v. State,*
    388 S.W.2d 710 (Tex. Crim. App. 1964). ...................................................2

*Lerma v. State,*
    807 S.W.2d 599 (Tex. App.–Houston [14th Dist.] 1991, pet. ref'd).....................10

*Mendoza v. State,*
    349 S.W.3d 273 (Tex. App.–Dallas 2011, pet. ref'd).................................. 6, 17, 19

*Reeves v. State,*
   No. 01-10-00395-CR, 2012 WL 5544770 (Tex. App.—Houston
   [1st Dist.] Nov. 15, 2012) (mem. op. on reh'g, not designated for publication)..6, 7

*Reeves v. State,*
   420 S.W.3d 812 (Tex. Crim. App. 2013) ....................................................... 6, 9, 15

*Reynolds v. State,*
   371 S.W.3d 511 (Tex. App.—Houston [1st Dist.] 2012, no pet.)...........................10

*Saxton v. State,*
   804 S.W.2d 910 (Tex. Crim. App. 1991) ...............................................................13

*Smith v. State,*
   965 S.W.2d 509 (Tex. Crim. App. 1998) ....................................................... 3, 4, 6, 7

*Vega v. State,*
   394 S.W.3d 514 (Tex. Crim. App. 2013) ...............................................................11

**Statutes**

TEX. PENAL CODE ANN. § 9.04 ...................................................................................9

TEX. PENAL CODE ANN. § 9.31 ...................................................................................1

TEX. PENAL CODE ANN. § 9.32 .................................................................................12

**Secondary Authority**

Tex. Pattern Jury Charges, *Criminal Defenses,* § B14.2 ..............................................16

TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:

Appellant, Jose Guadalupe Rodriguez Elizondo, respectfully requests that this Court grant his petition for discretionary review and respectfully shows:

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would be beneficial in this case because it presents unique circumstances that should be addressed by this Court. Specifically, this case presents complicated issues of self-defense, provocation, and abandonment of the difficulty, and a grossly erroneous jury charge on those defensive issues, with which counsel for appellant can assist the Court through oral argument.

## STATEMENT OF THE CASE[1]

This case involves complicated isues of self-defense arising from two separate altercations. After his wife was mistreated by a bouncer at a nightclub, Elizondo—an off-duty United States Customs officer—was involved in an initial altercation with the bouncer and several others outside the club.[2] Elizondo was outnumbered during this initial altercation, and he feared for his life.[3] The undisputed evidence shows

---

[1] The clerk's record consists of one volume and two supplemental volumes, which will be

[2] 16RR183-192.

[3] 12 RR 178, 180; 16RR191-195; 17 RR 19, 21.

that Elizondo sought to abandon the difficulty by running nearly seventy yards to his truck and getting inside the vehicle.[4]

Nevertheless, the bouncers chased Elizondo all the way to his truck, cursing and yelling at him to stop running, and then "banging on the windows" of the truck to force him out.[5] Once at the truck, Elizondo was forcefully removed from it and engaged in a second altercation with the men.[6] As part of this second altercation, the club's owner, Fermin Limon, Sr., pointed a gun at Elizondo, refused to put the weapon down after being told to do so by Elizondo, and Elizondo fired his own gun in self-defense, causing Limon, Sr.'s death.[7]

The court of appeals acknowledged this sequence of events but dismissed Elizondo's self-defense argument with two short, conclusory paragraphs, glossing over Elizondo's arguments distinguishing the two altercations and his assertion that he abandoned the difficulty. *Elizondo v. State*, No. 13-12-00028-CR, 2014 WL222834, at *6 (Tex. App.–Corpus Christi Jan. 16, 2014, pet. filed) (mem. op., not designated for publication). The court held that an alleged statement by Elizondo *after* he had already started to flee the difficulty and *after* the men initiated

---

[4] 12RR178, 180; 13RR15, 26, 66; 14RR100-103, 126, 235; 15RR80, 133-137, 233; 16RR113, 197; 21RRDX21.

[5] 13RR149, 179; 14RR104, 105; 15RR41-42, 237; 16RR27-29.

[6] 16RR201-203.

[7] 12RR180-181; 13RR16, 68-69, 134-137, 171-173; 14RR108-109, 250; 15RR15-17, 44-47, 138, 140, 143, 152; 16RR38, 206-207, 214-215.

a chase to his vehicle provoked the second altercation, undermining Elizondo's self-defense justification. *Id.* The court, however, did not analyze the elements of provocation with respect to these statements. *Id.*

Moreover, the jury charge was incomplete and woefully erroneous. The court of appeals rejected Elizondo's complaints about the jury charge without analyzing all of Elizondo's arguments and without conducting a full harm analysis. *Id.* Elizondo is currently serving a 25-year sentence for murder.[8]

## STATEMENT OF PROCEDURAL HISTORY

| | |
|---|---|
| *Date and citation to Court of Appeals Opinion:* | The Thirteenth Court of Appeals issued its opinion and judgment on January 16, 2014. *Elizondo v. State*, No. 13-12-00028-CR, 2014 WL222834 (Tex. App.—Corpus Christi Jan. 16, 2014, pet. filed) (mem. op., not designated for publication). |
| *Motion for Rehearing and Reconsideration En Banc:* | Elizondo timely filed motions for rehearing and for reconsideration en banc on March 3, 2014 (the Thirteenth Court granted an extension of time). |
| *Court of Appeals' Disposition:* | The Thirteenth Court of Appeals overruled Elizondo's motions for rehearing and for reconsideration en banc on June 30, 2014, and this Court extended the time to file a petition for discretionary review. |

---

[8] CR69-71.

viii

# GROUNDS FOR REVIEW

1.      The evidence showed that Elizondo fled nearly 70 yards to his vehicle and got inside—the only realistic place to run under the circumstances—only to be chased by his attackers and forcibly removed from the vehicle. Under those circumstances, did Elizondo sufficiently "abandon the difficulty" to support a self-defense justification, or was his flight a mere change of position of the parties and a continuation of the prior altercation?

2.      The State alleged that after Elizondo fled the initial altercation and *after* his attackers began their pursuit, Elizondo made statements that provoked a second attack. Was the court of appeals required to conduct a full analysis of the elements of provocation under *Smith v. State*, including (1) whether the defendant did some act or used some words which provoked the attack on him; (2) whether the act or words were reasonably calculated to provoke the attack; and (3) whether the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting some harm on another? Should the Court reverse and render a judgment of acquittal when the words allegedly spoken after a pursuit was already underway could not have possibly provoked a pursuit and a further attack, and where there is no evidence that the defendant intended to provide a pretext for inflicting harm?

3. The jury charge contained numerous errors and omissions, which the court of appeals recognized. Yet the court of appeals erroneously (1) held that omissions from the charge were waived by defense counsel, and (2) failed to apply the appropriate harm standard to all the errors presented. Should the Court reverse under these circumstances, where after applying the correct harm analysis, it appears that the charge as a whole was incomplete, the instructions actually provided were woefully inaccurate, and the charge failed to protect and preserve Elizondo's only defense?

## I. Fleeing to a vehicle nearly 70 yards away from an initial altercation should be sufficient abandonment and not a mere change of position.

Provocation and abandonment are central, complex issues in this case, involving a multi-part inquiry. The court of appeals below failed to conduct a thorough analysis, instead essentially ignoring Elizondo's "abandonment" argument. As a result, a former United States Customs officer is serving a twenty-five year murder sentence.

"[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). A defendant, however, is not entitled to use force "if the actor provoked the other's use or attempted use of unlawful force, unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and (B) the other nevertheless continues or attempts to use unlawful force against the actor . . . ." *Id.* § 9.31 (b)(4).

When there are multiple altercations, courts looking at provocation first determine if the initial encounter was abandoned. *See Carlile v. State*, 255 S.W. 990, 991-92 (Tex. Crim. App. 1923). This Court has held that "the abandonment of the

1

difficulty by the defendant does not arise where the difficulty was continuous, the only change being in the position of the parties during the progress of the encounter." *Ervin v. State*, 367 S.W.2d 680, 683-84 (Tex. Crim. App. 1963). Rather, it is "necessary that the intention to abandon the difficulty be, in some manner, communicated by the appellant so as 'to advise his adversary that his danger had passed, and make his conduct thereafter the pursuit of vengeance rather than measures to repel the original assault.'" *Id.* at 684.

Logically, flight from an altercation will always be a "change of the position of the parties," and this Court has never explained just how much distance is enough to constitute abandonment. The Court should take the opportunity to clarify that fleeing to a vehicle—where that is the only reasonable location to retreat—is sufficient abandonment. *See, e.g., Gray v. State*, 388 S.W.2d 710, 712 (Tex. Crim. App. 1964).

Here, it is undisputed that the first altercation occurred at the nightclub's door. Regardless of whether Elizondo provoked the initial altercation, he nevertheless ran almost 70 yards to his vehicle, got inside, and shut the door.[9] This was not a mere "change of position." Running that far away from an altercation and getting in a vehicle is abandonment, yet the lower court's opinion does not address whether Elizondo's flight sufficiently communicated his intent. There was no

---

[9] 11RR95; 12RR178, 180-181; 13RR15, 26, 66; 14RR100-103, 126, 235; 15RR80, 133-137, 233; 16RR113, 197; 21RRDX21.

2

testimony (1) demonstrating that Elizondo could have fled to any other location, or (2) that Elizondo should have left his wife and truck at the establishment in order to abandon the altercation.[10] It is unclear what more he could have done. That should not be the law in Texas, and this Court should grant the petition to clarify the law of abandonment.

## II. The court of appeals should have analyzed all the elements of *Smith v. State* before determining that Elizondo provoked the second altercation.

The court of appeals found that Elizondo provoked the second altercation, yet it did so without conducting a full analysis as required in *Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998). To invoke the provocation exception to self-defense, the State must show that

  (1)   that the defendant did some act or used some words which provoked the attack on him,

  (2)   that such act or words were reasonably calculated to provoke the attack, and

  (3)   that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Id.* The State must show that Elizondo performed some act or used words that actually provoked the attack, the words or acts were the type that would ordinarily

---

[10] *See generally* RR.

3

provoke an attack, and he intended to provoke an attack to have a pretext for killing Limon, Sr. *See id.*

Elizondo specifically argued that the first and second altercations should be distinguished based on the timing of the events, the first altercation was abandoned when he ran to nearly 70 yards and got inside his vehicle, and there was no evidence he said or did anything as a pretext to kill Limon, Sr. Rejecting Elizondo's arguments in one short paragraph, the court below held:

> Elizondo argues, however, that even assuming he provoked the initial difficulty, he abandoned this first encounter near the bar by running to his pickup truck. This abandonment would thus make him eligible for the self-defense affirmative defense. However, we conclude that a reasonable jury could have found otherwise. Junior testified that when Elizondo left the first difficulty and ran to his pickup truck, he was yelling, "Van a ver," roughly translated as "You will see." Junior was frightened by that statement and believed it constituted a threat to him and his co-workers. Further, the jury had Elizondo's police statement wherein he admitted that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports the jury's implied finding that Elizondo was running to his truck for his firearm, not to abandon or discontinue the fight.

*Elizondo*, 2014 WL 222834, at *6 (citations omitted).

Affirming on these grounds, however, the court failed to address all of Elizondo's arguments, including:

a.     The court of appeals relied on Elizondo's alleged statement "van a ver"—translated as "you will see"—while running away from the initial altercation. *Id.*

4

Elizondo argued that these words did not actually provoke the pursuit, which was already under way, or the continued attack at his truck. Elizondo expressly testified that he ran to his truck to get away from his attackers and got inside the vehicle.[11] The only testimony regarding the initial reason for the chase came from a bouncer named "Junior," who claimed that he followed Elizondo to his truck to make sure he left safely, which is completely consistent with Elizondo's abandonment of the difficulty.[12] The court of appeals disregarded this uncontradicted testimony.

Yet, upon arriving at the truck and discovering Elizondo inside, Junior did not then just make sure that Elizondo left—he admitted to hitting Elizondo's vehicle, and other witnesses testified that Junior was also yelling, "Get off, asshole."[13] In fact, Rodrigo testified that Junior was trying to get Elizondo to come out of his truck.[14]

Junior testified that while Elizondo was running away he said the words, "Van a ver," or "you're going to see," claiming that he took those words as a threat, but Junior expressly testified that he had already started the pursuit by that time.[15] Thus, those words did not actually provoke the pursuit of Elizondo by Rodrigo, Bryan, and

---

[11] 16RR113-114, 191-195; 21RRDX21.

[12] 16RR9-10, 25.

[13] 13RR149, 179; 14RR104-105; 15RR41-42; 16RR27-29.

[14] 15RR80.

[15] 15RR234-235.

Junior, which was already underway.[16] *Smith*, 965 S.W.2d at 512 ("A defendant may have a desire that the victim will attack him, or he may seek the victim with the intent to provoke a difficulty, but the defendant must go further and do or say something which *actually* provokes the attack before he will lose his right to self-defense.") (emphasis added); *Reeves v. State*, No. 01-10-00395-CR, 2012 WL 5544770, at *4 (Tex. App.–Houston [1st Dist.] Nov. 15, 2012) (mem. op. on reh'g, not designated for publication) ("Such threats and conduct could not have provoked a fight that was already in progress."), *aff'd*, 420 S.W.3d 812 (Tex. Crim. App. 2013). This would be a necessary element of any claim by the State that Elizondo's words, while already running away, actually provoked the second altercation, and it is simply insufficient given the sequence of events. *See Mendoza v. State*, 349 S.W.3d 273, 280-81 (Tex. App.–Dallas 2011, pet. ref'd).

b.      The court of appeals likewise did not address whether the words "van a ver" were reasonably calculated to provoke a pursuit and further attack. In fact, the opinion does not mention this requirement at all. Elizondo argued there was no showing that the words were reasonably calculated to provoke an attack or that the words were used for the purpose and with the intent to provide Elizondo with a pretext for inflicting harm upon Junior or the ulitmate victim, Limon, Sr. *Smith*, 965

---

[16] 15RR234-235.

S.W.2d at 512. "Although a jury can rely upon wholly circumstantial evidence to find provoking acts or words, such evidence must create more than a suspicion because juries are not permitted to reach speculative conclusions." *Reeves*, 2012 WL 5544770, at *5. There was simply no evidence to support a finding that the words, "Van a ver," were of the type that were reasonably capable of causing an attack or had a reasonable tendency to cause an attack. *Smith*, 965 S.W.2d at 517 ("An act is reasonably calculated to cause an attack if it is reasonably capable of causing an attack, or if it has a reasonable tendency to cause an attack. Some provoking acts or words can by their own nature be legally sufficient to support a jury finding.").

In fact, Junior's own explanation for the pursuit belies any reliance on the words, "Van a ver," as the provocation for the second altercation, as he testified he followed merely to make sure that Elizondo was going to leave *and* that Elizondo's words were spoken after the pursuit was already underway.[17] Yet, once he discovered Elizondo already inside the vehicle, he banged on the window to get him out of the truck.

There was *nothing* presented that showed that Elizondo intended to do anything other than escape the attack by running to his truck—there is nothing to support a finding that Elizondo intended his actions to provoke Limon, Sr. into

---

[17] 15RR234-235; 16RR9-10, 25.

7

pointing a weapon at him as a pretext for killing him. The court of appeals relied on a statement given to police where Elizondo said that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." *Elizondo*, 2014 WL 222834, at \*6. The fact that Elizondo ran towards his truck where his gun was located does not imply that he intended to continue the altercation at the truck or that he intended to use the altercation as a pretext to kill Limon, Sr.—in fact, the same statement shows that Elizondo perceived that the men were "attacking" him and he "just thought [he] needed to get away from them before they take him to the ground."[18] The statement relied upon by the court of appeals can only support its decision when taken completely out of context. Elizondo respectfully requests that this Court grant the petition and conduct the analysis that the court of appeals should have undertaken.

### III. The court of appeals affirmed on a jury charge that was grossly incorrect by ignoring and then misapplying this Court's precedent.

The court of appeals' opinion demonstrates an inconsistent application of this Court's precedent that could lead to erroneous future decisions in an area of

---

[18] 21RRDX21.

law that is already confusing at best. Elizondo raised four[19] different charge errors, which the court of appeals erroneously rejected without applying the proper preservation and harm standards. Ultimately, Elizondo's conviction was affirmed on a jury charge that was an "impenetrable forest of legal 'argle-bargle.'" *Reeves*, 420 S.W.3d at 817.

## A. The court of appeals erroneously refused to review two omissions from the charge, in conflict with this Court's prior decisions

Elizondo argued below that once the trial court undertook to charge the jury on the law of self-defense, it had the obligation to provide correct and complete instructions—the self-defense instructions should have included instructions on the law of multiple assailants and threats as justifiable force.

The jury charge did not provide an instruction on section 9.04, regarding a threat of deadly force by production of a weapon. *See* TEX. PENAL CODE ANN. § 9.04. This was certainly raised by the evidence. Elizondo stated he intended to grab his gun and his credentials and thought that if he displayed them, the men might

---

[19] Elizondo also argued that provocation should not have been submitted to the jury. Again, the court of appeals failed to properly apply *Smith v. State* to the evidence and rejected Elizondo's charge arguments based on its erroneous finding that Elizondo did not abandon the first encounter. Elizondo submits that if the court had properly analyzed *Smith v. State*, the jury charge should not have included a provocation instruction, and Elizondo respectfully requests the ability to fully brief this issue if review is granted.

9

stop.[20] *Reynolds v. State*, 371 S.W.3d 511, 522 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Additionally, the jury charge omitted any reference to the law of multiple assailants, instead instructing the jury with reference only to Limon, Sr.'s conduct. This Court, however, has held that when there are multiple assailants, a jury charge focusing on only one of those assailants is too restrictive. *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985); *Lerma v. State*, 807 S.W.2d 599, 601 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). There was certainly evidence in the record that multiple attackers were pursuing Elizondo.[21] It was error for the trial court to limit its instructions to Elizondo's beliefs as to the "person against [whom] deadly force was used."[22]

Elizondo argued below that *Barrera v. State* required treating the omission of the multiple assailants charge as "error" that the court could properly review under *Almanza*. In *Barrera*, this Court held that when a trial court undertakes to instruct a jury on a defense raised by the evidence, that defense becomes the law applicable to the case, and the trial court has a duty to state the law correctly. *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998). The Court held that where a self-defense instruction contains an error to which counsel did not object—in that case a

---

[20] 16RR200-201.
[21] 17RR19, 21.
[22] 2Supp.CR3.

10

complete omission of an application paragraph—the error is subject to review for egregious harm. *Id.* at 417.

This Court later clarified that it does not matter if the defensive instruction was initially requested by the defendant or sua sponte included by the judge—the judge bears sole responsibility for errors in the charge:

> However, if the trial judge does charge on a defensive issue *(regardless of whether he does so sua sponte or upon a party's request),* but fails to do so correctly, this is charge error subject to review under *Almanza.* If there was an objection, reversal is required if the accused suffered "some harm" from the error. If no proper objection was made at trial, a reversal is required only if the error caused "egregious harm."

*Vega v. State,* 394 S.W.3d 514, 518-19 (Tex. Crim. App. 2013) (emphasis added). The court of appeals, however, refused to recognize this precedent and held that both the "threats as justifiable force" and "multiple assailants" issues were waived by defense counsel's failure to request the instructions. *Elizondo,* 2014 WL 222834, at *10. The court erroneously refused to review these errors or apply a harm analysis.

**B.    The court of appeals erroneously failed to properly apply the appropriate harm analysis to the other charge errors**

Elizondo further pointed out two other errors in the jury charge, which the court of appeals held were reviewable but then failed to properly analyze under *Almanza.*

11

First, the presumption of reasonableness instruction was incomplete. The jury was instructed that a presumption of reasonableness would arise if the actor "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder."[23] However, Texas Penal Code section 9.32(b) provides that the presumption arises in two other situations raised by the evidence in this case, where the actor knew or had reason to believe an assailant "(A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;" and "(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment." TEX. PENAL CODE ANN. § 9.32(b)(1)(A)-(B). Here, the evidence showed that Elizondo knew or had reason to believe that Junior either unlawfully and with force entered Elizondo's vehicle or removed him from the vehicle, or was attempting to do so.[24] Defense counsel did not object to this charge, and while the court of appeals agreed that the evidence "warranted the inclusion of these instructions," it nevertheless found that the error was not egregiously harmful. *Elizondo*, 2014 WL 222834, at *9.

---

[23] 2Supp.CR3.

[24] 12RR178, 180; 13RR15, 26, 66; 14RR126, 235; 15RR133-134; 15RR233; 16RR113, 197; 21RRDX21.

Second, Elizondo argued that the provocation instruction changed the State's burden of proof by erroneously telling the jury that if it found provocation, it must find Elizondo guilty of murder.[25] The jury received this 169-word, unintelligible instruction:

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficultly, then and there did some act, or used some language, or did both, as the case may be, with the intent on his, the defendant's, part to produce the occasion for killing the deceased, Fermin Limon, and to bring on the difficultly with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, if you find there was such design, then *you will find the defendant guilty of murder.*[26]

The jury should not have been instructed that if it found provocation, it should find Elizondo guilty—rejection of self-defense does not require a finding of all the elements of murder. In fact, the jury was required to find all the elements of murder *and* reject self-defense in order to convict. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). While the court of appeals erroneously determined otherwise,

---

[25] 2Supp.CR6.

[26] 2Supp.CR5-6 (emphasis added).

defense counsel did not object to this error.[27] The court found no harm, but it did so without evaluating the *Almanza* factors. *Elizondo,* 2014 WL 222834, at *9.

In addressing these two charge errors, while paying lip service to the applicable standard of review, the court of appeals did not engage in any analysis at all. *Id.* With respect to the presumptions of reasonableness, the court of appeals held that because the jury "could have found that Elizondo was not entitled to a self-defense argument because he provoked the initial difficulty and did not abandon the encounter, . . . these extra instructions would not have affected the outcome." *Id.* But just because the jury could have believed the State's version of the evidence does not mean that it was not harmful to submit an incomplete version of Elizondo's defense. *Cornet v. State*, 417 S.W.3d 446, 453 (Tex. Crim. App. 2013) ("We agree with appellant that a review for sufficiency of the evidence cannot substitute for a harm analysis.").

With respect to the erroneous provocation instruction, the court of appeals held that "from voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that Elizondo committed murder." *Elizondo,* 2014 WL 222834, at *9. Those "repeated" instructions were completely undermined

---

[27] *See generally* 17 RR.

14

by the instruction that if it rejected provocation, the jury must find Elizondo guilty of murder, yet the court of appeals did not address that argument.

### C. The jury charge was a garbled mess, and a review of the complete charge and application of the proper harm analyses requires reversal.

Considering the entire jury charge and all the harm factors, it becomes clear that Elizondo suffered the requisite degree of harm. As this Court recently explained,

> The trial judge must "distinctly set[ ] forth the law applicable to the case" in the jury charge. "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion." While generally, "in the absence of evidence to the contrary, we will assume that the jury followed its written instructions," this presupposes that the instructions are understandable. Because these instructions were not, "this is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written."

*Reeves*, 420 S.W.3d at 819. When the jury charge contains numerous errors, incomprehensible wording, and essentially robs the defendant of his only defense, the Court should be extraordinarily careful to analyze the harm, recalling that neither party has a burden on this issue—the burden of properly analyzing harm falls squarely on this Court. *Id.* at 816, 819.

15

Here, as in *Reeves*, the jury charge contained numerous errors and was incomplete.[28] Additionally, the state of the evidence mandates a finding of the requisite degree of harm. With respect to provocation and the presumption of reasonableness, the evidence was undisputed that Junior and two others pursued Elizondo to his vehicle, and Elizondo testified that Junior pulled him out of the vehicle.[29] All the witnesses testified that, at the very least, Junior was beating on Elizondo's car and trying to force him to come out.[30] But the jury was never instructed that, if it believed those facts, a presumption of reasonableness could arise.[31] Instead, in order to raise the presumption, they were instructed that they had

---

[28] The charge contained numerous confusing "converse" instructions, which tell the jury that "if the state met its burden, the juries should find against the defendants on the issue of self defense," and which have been criticized by the Texas Pattern Jury Charge committee on Criminal Defenses:

> The Dallas court of appeals in 1999 appeared sympathetic to a defendant's argument that a converse instruction of the second type is an 'anachronism in Texas law' that violates the spirit of the prohibition against comment on the evidence. Nevertheless, it held that it was bound to precedent establishing that the giving of such a converse instruction is not a basis for reversing a conviction. *Aldana v. State*, No. 05-98-00135-CR, 1999 WL 357355, at *6-7 (Tex. App.—Dallas June 4, 1999, pet. ref'd) (not designated for publication) (relying on Powers v. State, 396 S.W.2d 389, 391-92 (Tex. Crim. App. 1965)). The Committee concluded that if jury instructions on self-defense are properly crafted, so-called converse instructions are neither necessary nor desirable. Thus the instruction at section B14.4 below does not include them.

Tex. Pattern Jury Charges, *Criminal Defenses,* § B14.2.9.

[29] 12RR180; 13RR15, 26, 66; 14RR126, 235; 15RR133-134, 233; 16RR113, 197, 201-203; 21RRDX21.

[30] 13RR149, 179; 14RR104-105; 15RR42, 80, 237; 16RR29.

[31] 2Supp.CR.3.

to find that Elizondo knew or had reason to believe that Limon was committing or attempting to commit "murder."[32] Compounding this problem was the lack of a multiple assailants instruction, which would have allowed the jury to consider Junior's conduct, as well as the other two assailants.[33] Instead, all of the language in the charge referred to Limon's conduct alone.[34] Under these circumstances, the jury charge failed to adequately protect Elizondo's right to argue self-defense. *See Brown v. State*, 651 S.W.2d 782, 784 (Tex. Crim. App. 1983).

Second, any evidence of guilt was not so overwhelming that the jury charge errors necessarily caused no harm to Elizondo. *Mendoza*, 349 S.W.3d at 282. But nevertheless, the jury was not only instructed to disregard Elizondo's self-defense if it found provocation, it was instructed to *find Elizondo guilty of murder. Cf. id.* In other words, the jury charge implied not only that there was some evidence to support every element of provocation, but that there was some evidence to support every element of *murder. Cf. id.*

Furthermore, self-defense was the focus of the entire case.[35] Specifically, Elizondo's defense centered on the following: (1) he abandoned the difficulty by

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *See* 17RR82.

17

running to his truck;[36] (2) the club's bouncers chased Elizondo to his truck yelling obscenities with the intent to continue an attack on Elizondo;[37] (3) Junior then banged on Elizondo's window to get him out of the truck;[38] (4) Elizondo was pulled out of his truck, and then Limon. Sr. pointed a gun at him.[39] For example, provoking the difficulty was not a theory that was downplayed or ignored by the State—provocation was the State's central argument. Specifically, the State argued during closing:

> This moment in time is pivotal, because he runs from what he says are five or six guys beating on him. That's what he told Deputy Hector Garcia. This moment is pivotal, because this is where he said— or Trooper Champion said that he just got kicked in the head. He further says that at some point in time, he books it to his car, to his truck, and on the way, he is getting hit on the head (knocking).
>
> . . . .
>
> Somewhere along the way, while he's running, he gets hit on the head. In his statement he says, at least twice. He needs you to believe that he's being beaten (indicating).
>
> . . . .
>
> He gets to his truck, first thing he does is pull out a weapon. Now, his testimony is that he got into his truck and closed the door. Far different from what is in his statement. He grabs the gun—and he

---

[36] 17RR89.

[37] 17RR90-92.

[38] 17RR95-96.

[39] 17RR98.

18

decides to grab that gun—and at that point in time when he grabs that gun, another escalation. Things just got deadly, and all bets are off. Everybody's life now is in danger.[40]

Thus, the State did not distinguish between the two altercations, but was allowed to argue that the first altercation was the provocation that mattered. The self-defense instructions took up a significant part of the jury charge.[41] *Mendoza*, 349 S.W.3d at 283. Furthermore, the state of the evidence shows egregious harm, given that Elizondo admitted to shooting Limon. *See id.*

## CONCLUSION AND PRAYER

This Court should grant review, request additional briefing, and render the judgment that the court of appeals should have rendered. The Court should reverse the judgment of the lower courts and render a judgment of acquittal or, alternatively, reverse and remand for further proceedings below.

---

[40] 17RR112-114.

[41] *See* 2Supp.CR5-6.

Respectfully submitted,

/s/ *Brandy Wingate Voss*
Brandy Wingate Voss
State Bar No. 24037046
SMITH LAW GROUP, P.C.
820 E. Hackberry Ave.
McAllen, TX 78501
(956) 683-6330
(956) 225-0406 (fax)
brandy@appealsplus.com
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4(e)

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), because it contains 4,499 words, excluding the parts exempted by Rule 9.4.

/s/ Brandy Wingate Voss
Brandy Wingate Voss

# CERTIFICATE OF SERVICE

On March 11, 2015, in compliance with Texas Rule of Appellate Procedure 9.5, I served a copy of this document upon all other parties to the trial court's judgment and the respondent by first-class United States mail, return receipt requested, properly posted and deliverable as follows:

Ted Hake
Michael Morris
*Assistant District Attorney*
Appeals Section
Office of Criminal District Attorney
Hidalgo County, Texas
100 N. Closner, Rm 303
Edinburg, Texas 78539
Fax: (956) 380-0407
ted.hake@da.co.hidalgo.tx.us
michael.morris@da.co.hidalgo.tx.us


Lisa C. McMinn
John R. Messinger
*State Prosecuting Attorney*
Office of State Prosecuting Attorney of Texas
P. O. Box 13046
Austin, Texas 78711-3046
Fax: (512) 463-5724

/s/ Brandy Wingate Voss
Brandy Wingate Voss

# APPENDIX

2014 WL 222834
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
**Do not publish. Tex.R.App. P. 47.2(b).**
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Jose Guadalupe Rodriguez ELIZONDO, Appellant,
v.
The STATE of Texas, Appellee.

No. 13–12–00028–CR. | Jan. 16, 2014.

On appeal from the 398th District Court of Hidalgo County,
Texas.

**Attorneys and Law Firms**

Brandy M. Wingate, for Jose Guadalupe Rodriguez Elizondo.

Rene A. Guerra, for The State of Texas.

Before Chief Justice VALDEZ and Justices BENAVIDES
and LONGORIA.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice BENAVIDES.

**\*1** Appellant, Jose Guadalupe Rodriguez Elizondo, was
convicted of murder and sentenced to twenty-five years
in prison at the Texas Department of Criminal Justice—
Institutional Division. By two issues, Elizondo argues that:
(1) the evidence was legally insufficient to support the jury's
rejection of his self-defense argument and (2) the jury charge
was erroneous and harmful, requiring reversal. We affirm.

**I. BACKGROUND**

The undisputed facts reveal that, on August 8, 2010, appellant
Elizondo, his brother Juan, and his wife Maria went to
a barbeque at Elizondo's mother house. At the barbeque,
Elizondo, Juan, and Maria socialized. Elizondo testified that
he drank approximately two beers, while his brother Juan

admitted to finishing a six-pack of beer. Maria did not drink at
that time. The three then decided to go to Punto 3, a nightclub
in Mission, Texas. Punto 3 was owned by Fermin Limon, Sr.,
his wife Nora, his son Fermin Limon, Jr. (Junior), and his
daughter Mireya. Elizondo and Maria went home to change
and then proceeded to the bar. Juan was picked up by a
friend and arrived later. All of the parties were at the bar
by 12:45 a.m. At this point, the versions of what occurred
differ, therefore, we will summarize each relevant witness's
testimony.

**A. Jose Elizondo**

Elizondo, a customs agent employed by the United States
Department of Homeland Security, testified that he arrived at
the bar with his wife in his white Dodge pickup. He stated
that, as a licensed peace officer for the State of Texas, he
has an assigned pistol from U.S. Customs. This pistol was
in the console of his pickup truck, as well as his credentials
identifying him as a federal agent. Elizondo explained that,
under federal law, he is authorized to carry a weapon at all
times. He left his pistol and credentials in the car when he and
his wife entered the club.

Elizondo testified that he had gone into the bar and then went
outside, when he saw his wife Maria exit the bar looking
"teary-eyed," "emotional," and "in distress." He asked her
what was wrong and she said that someone pushed her "really
ugly." She pointed to the man who had allegedly pushed
her, who turned out to be Junior. Elizondo asked Junior why
he had pushed his wife, and he said Junior was cocky and
aggressive towards him. Elizondo claimed that he did not
know Junior worked at the bar because he was wearing a
different shirt than the other Punto 3 employees—he thought
Junior was just another customer. Elizondo called Junior a
curse word in Spanish and Junior responded by pushing him.
Elizondo pushed back. Then, Elizondo claimed that Rigo,
another security employee, punched Elizondo on the right
side of his face. Elizondo punched back, and then became
enthralled in a brawl with at least four nightclub employees.
Elizondo believed that he could be killed if he fell to the
ground, so as soon as he could, he ran to his truck. The
distance from the bar to his truck was approximately seventy
yards. Elizondo testified that he could not believe it when
he realized his aggressors were following him. He stated that
he heard, "Stop, asshole," and that the men tried to trip his
boots, but he did not stop running. He ran past a fence to
his car. While running, he pulled out the control to his truck
and unlocked his pickup. He testified that, at that time, he
remembered he had his gun in the truck.

**\*2**  As soon as he arrived at his pickup, Elizondo testified that he got in, closed the door, and grabbed the gun from his console. He wanted to grab his credentials, too, but he claimed that Junior reached in and pulled him out of his truck. After being pulled out, Elizondo claimed he started hitting Junior to protect himself. Then, Elizondo's brother Juan arrived and pulled Junior off of him. At that point, Elizondo then saw a man approaching his vehicle with a gun. This person was Limon. Elizondo testified that Limon pointed the gun at him and did not say anything. Elizondo claimed that he shouted to Limon, "U.S. Customs" and told him to "throw the gun" about two times. He claimed that Limon never lowered his gun. Elizondo fired, claiming he had "no other choice" because he was convinced Limon was going to shoot.

On cross-examination, the prosecution questioned Elizondo with the statement he gave to police the night of the shooting. Although Elizondo testified that he didn't remember he had his gun in his console until he began running to his truck, his statement provided that, "I ran towards my truck where I had my duty issued H & K 40 Caliber handgun." The prosecution suggested that Elizondo ran to the truck specifically to retaliate against the security guards with his gun. Elizondo denied this assertion.

**B. Juan Elizondo**

Juan, appellant's brother, testified that when he arrived at Punto 3 with his friend, Elizondo and his wife were already there. Juan said hello to some friends. He then bought a beer for himself and his brother, and a mixed drink for his sister-in-law Maria. He stated that he saw a fight erupt between two women and that he tried to break up the fight, even though his brother told him "not to get involved." Juan was escorted out of the building by Punto 3 security along with the two fighting women. After explaining the situation to Limon, Sr., whom he thought was the head of security or a manager, he was allowed back inside the club.

As soon as Juan entered, though, he testified that he noticed people running out. He heard a "commotion" and went outside again, because he did not see his brother inside the club. He also thought he heard his sister-in-law Maria yelling. When he got outside, Juan saw Maria "crying" and "yelling." Juan saw "at least three guys hitting" Elizondo when his brother started running to his pickup truck. Juan testified that the three security guards followed his brother, so he ran after them, too. When he arrived at Elizondo's truck, he saw Elizondo and Junior struggling. He pulled Junior off his

brother's back and began fighting with him. At that point, he heard his brother yell, "U.S. Customs" and "please put the gun down." Then he heard two gunshots.

**C. Maria Elizondo**

Maria Elizondo, Elizondo's wife, confirmed that her husband and brother-in-law Juan had been drinking at their mother's home prior to going to Punto 3. After she and her husband arrived at the Punto 3 nightclub, Juan handed her a margarita. Maria and her husband then danced two songs. After dancing, Maria talked to some friends while her husband went with his brother. When Maria saw her husband exiting the bar, she started to follow him out. She still had her drink in her hand. She testified that, as she approached the exit, a female employee working at the front entrance stated, "This stupid lady doesn't want to leave her drink behind." Maria went back and set her drink down at the bar, but stated that she was offended by the woman's words. She testified that as she was walking back towards the entrance, Junior arrived and grabbed her. Maria testified that he told her, "I know women like you" and to "get out." Then, according to Maria, Junior pushed her and took her outside. Junior then went back into the club.

**\*3**  Maria, upset, began looking for her husband outside. She noticed Junior had returned outside laughing and she thought he was making fun of her. She found her husband, pointed Junior out to him, and explained that Junior had pushed her inside. Maria stated that Elizondo then asked Junior, "Why were you pushing my wife?" A fight then ensued. Maria claims that a security guard punched her husband in the face, and that the men were yelling, grabbing, and pushing. She said she yelled at the Punto 3 security guards to leave her husband alone. Then, she testified that her husband started running towards his truck and that the security guards followed him, yelling, "Stop asshole!" She also testified that they were trying to trip him while he was running.

Maria ran to her husband's truck, where all the men had convened. She saw her husband pointing a gun saying, "Lower your weapon. Lower your weapon." She did not hear him say that he was a U.S. Customs agent. Then, Maria heard her husband's gun fire.

**D. Francisco Garcia**

Francisco Garcia worked at Punto 3 as a general employee. His job responsibilities included setting up for the night, cleaning, working at the door to check for weapons and proper

age identification, assisting with security, and performing tasks as required by the Limon family. He carried a walkie-talkie and wore a microphone to be in constant communication with his employers throughout the night.

Francisco testified that, at approximately 1:00 a.m. on August 9, 2013, he was summoned by intercom and through his walkie-talkie to report to the bar section because a fight had broken out. He recalled that he, along with four other security guards, escorted two men and two women who had been fighting to the nightclub's exit. He then returned to his assigned watch area that night, the stage area. Seconds later, Francisco testified that he and all other security employees were alerted by their walkie-talkies to report outside. Outside, he noticed a group of people in a fight or "commotion." He witnessed the defendant Elizondo run to a white truck. He then witnessed some of his fellow employees follow Elizondo and then bang on the window of Elizondo's truck. According to Francisco, Elizondo then got out of his truck and hit Junior. He then heard a gunshot and someone yelled, "Run. There's a gun." At that point, Francisco called 911, as he saw his co-workers running from the truck back to the club. He then saw Limon, Sr. running alongside the fence towards the white truck. At that point, he did not see Limon, Sr. carrying a weapon. Once Limon, Sr. got closer to where his son, Junior, and Elizondo were, he noticed that Limon, Sr. and Elizondo were pointing guns at each other. He heard Elizondo tell Limon, Sr. to get on the ground, but Limon, Sr. did not. Instead, he saw Limon, Sr. hold the gun with one hand and make gestures with his other hand as if to calm Elizondo down. Francisco then heard more gunshots and saw Limon, Sr. fall. At that time, Francisco placed his second call to 911.

### E. Rodrigo Hernandez Carrion

 **\*4** Rodrigo Hernandez Carrion (Rigo) also worked at Punto 3 as a general employee. On the night of the incident, Rigo testified that he was called by walkie-talkie to remove some women from the premises for fighting. Outside, he saw Limon, Sr. and Junior talking to two men and a woman. He said the woman (presumably Maria) was hysterical and being disrespectful to Junior, calling him "idiot, stupid, sons of bitches." He heard Elizondo tell Junior, "Don't disrespect my woman you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?"

Rigo then testified that fighting started when Elizondo swung at Limon, Sr. A brawl ensued. Rigo then witnessed Elizondo run to his truck, get in, and "close [ ] the door and lock[ ] it." Rigo followed, along with his fellow employees. Rodrigo

witnessed Elizondo "looking for something in the console." Junior "got to the truck and was hitting the window," telling him to "Get off asshole." He said that then Juan, Elizondo's brother, grabbed Junior from behind. At that point, Elizondo got out and started hitting Junior with a gun on Junior's head and forehead. When Elizondo brandished his gun, though, Rigo left running, thinking he was going to be killed. He returned to the club and saw Limon, Sr. approaching the truck with a gun. Rigo said that Limon, Sr. had a gun in one hand and was making a gesture with the other hand as though to calm Elizondo down. He heard Elizondo say, "Get to the ground, son of a bitch. Get to the ground ... you dog." According to Rigo, before Limon, Sr. could respond, Elizondo "instantly" fired his weapon. Rigo stated that Elizondo never identified himself as a federal agent that worked for U.S. Customs. Rigo saw Limon, Sr. "walking, like, if he was in pain like it hurt," and then fall down.

### F. Fermin Limon, Junior

Junior worked for the family business as a bartender. He testified that, on the night of the incident, his wife, who worked at the front counter, informed him that a woman was trying to leave Punto 3 with an alcoholic drink. This woman was later identified as Maria, the defendant's wife. Junior claimed that he grabbed Maria's arm in an effort to stop her from leaving the premises with her drink, as the club would be fined by the Texas Alcoholic Beverage Commission for allowing that. He escorted her to the door and returned to the bar. At that point, his mother asked him to go outside and check on his father, as his father had exited when some patrons had been escorted outside.

Junior saw his father talking to two men and Maria. Maria, according to Junior, was screaming, calling Junior "*pendejo* " and a "dumb ass." Her husband, Elizondo, also called Junior a "*pendejo.*" Junior took offense to this, and his father Limon, Sr. told Elizondo not to insult his son. Limon, Sr. pushed his son back because Elizondo was being "aggressive." Junior testified that other employees, including Rigo and Francisco, were now near the commotion. Junior said that one man, either Elizondo or his brother Juan, then hit his father, Limon, Sr. Junior was shocked at this. Next, according to him, Rigo struck the man back with an open hand. After a skirmish, Elizondo began running, and the club employees followed him. Junior heard Elizondo say, "*Van a ver* "[1] while running, and Junior "got scared" because he felt it was "a threat." Junior kept following Elizondo because of this threat.

**\*5** When Junior arrived at the truck, Elizondo was "inside the truck ... searching around." Junior began hitting the driver's side window. While banging on the window, he felt someone grab him from behind in a headlock. It was Juan, Elizondo's brother. Then, Junior felt punches from both men. He heard a shot fired and then someone screamed that there was an "officer." After the shot, the men let him go and he ran back to the club. He did not see his father until he crossed the fence. When he saw Limon, Sr. "all bloody on the floor," he became hysterical.

## II. LEGAL SUFFICIENCY

### A. Standard of Review

In conducting a legal sufficiency review, we view the evidence in a light most favorable to the verdict and ask "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garcia v. State,* 367 S.W.3d 684, 686–87 (Tex.Crim.App.2012) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). The trier of fact, in this case the jury, is the sole judge of the credibility of witnesses and the weight, if any, to be given to their testimony. *Id.; Brooks v. State,* 323 S.W.3d 893, 899 (Tex.Crim.App.2010) (plurality op.). "The reviewing court must give deference to the responsibility of the trier of fact to fairly resolve conflict in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State,* 214 S.W.3d 9, 13 (Tex.Crim.App.2007) (citing *Jackson,* 443 U.S. at 318–19). In a sufficiency review, "circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* "Each fact need not point directly and independently to the guilty of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the verdict. *Garcia,* 367 S.W.3d at 687; *Brooks,* 323 S.W.3d at 899.

We measure the sufficiency of the evidence supporting a conviction "by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the

particular offense for which the defendant was tried." *Id.* A hypothetically correct murder charge in this case would have required the jury to find that Elizondo intentionally caused the death of Limon by shooting him with his gun. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

### B. Applicable Law

With regard to Elizondo's self-defense argument, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *See id.* § 9.31(a) (West 2011). The actor's belief that the force was immediately necessary is presumed reasonable if the actor knew or had reason to believe that the person against whom the force was used was attempting to commit a felony, like murder in this case. *Id.* § 9.31(a)(1)(C).

**\*6** The person who is claiming self-defense cannot have provoked the person against whom the force was used. *Id.* § 9.31(a)(2). The Texas Court of Criminal Appeals further elaborated on the doctrine of provocation in *Smith v. State:*

> Provoking the difficulty, as the doctrine of provocation is commonly referred to in our jurisprudence, is a concept in criminal law which acts as a limitation or total bar on a defendant's right to self-defense. The phrase "provoking the difficulty" is a legal term of art, and more accurately translates in modern usage to "provoked the attack." The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.

965 S.W.2d 509, 512 (Tex.Crim.App.1998). The use of force against another is not justified if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter and the other nevertheless continues or attempts to use unlawful force against the actor. TEX. PENAL CODE ANN. § 9.31(b)(4).

### C. Discussion

By his first issue, Elizondo complains that the evidence was legally insufficient to support the jury's rejection of his self-defense argument. We disagree. A reasonable jury could have believed that Elizondo provoked the fight, which made the self-defense argument unavailable. *See Smith,* 965 S.W.2d at 512. Rigo testified that Elizondo told Junior, "Don't disrespect my woman, you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?" Junior stated that Elizondo called him "*pendejo* " or "dumbass." Then, both Rigo and Junior testified that Elizondo swung, hitting Limon, Sr. Viewing the evidence in the light most favorable to the verdict, we hold that a reasonable jury could have rejected Elizondo's self-defense argument because they believed that he provoked the initial difficulty. *See id.*

Elizondo argues, however, that even assuming he provoked the initial difficulty, he abandoned this first encounter near the bar by running to his pickup truck. This abandonment would thus make him eligible for the self-defense affirmative defense. *See* TEX. PENAL CODE ANN. § 9.31(b)(4) (providing that self-defense is available to a defendant who leaves the altercation but is still pursued). However, we conclude that a reasonable jury could have found otherwise. Junior testified that when Elizondo left the first difficulty and ran to his pickup truck, he was yelling, "*Van a ver,*" roughly translated as "You will see." Junior was frightened by that statement and believed it constituted a threat to him and his co-workers. Further, the jury had Elizondo's police statement wherein he admitted that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports the jury's implied finding that Elizondo was running to his truck for his firearm, not to abandon or discontinue the fight.

**\*7** We overrule Elizondo's first issue.

### III. JURY CHARGE ERROR

In his second issue, Elizondo contends that the jury charge contained error.

#### A. Standard of Review
In analyzing a jury charge issue, or initial inquiry is whether error exists in the charge submitted to the jury. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App.2005) (en banc); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985). If error is found, the degree of harm

necessary for reversal depends on whether the appellant preserved the error by objection. *Ngo,* 175 S.W.3d at 743. If the defendant properly objected to the erroneous jury charge, reversal is required if we find "some harm" to the defendant's rights. *Id.* (citing *Almanza,* 686 S.W.2d at 171). If no objection was made, we may only reverse if the record shows egregious harm. *Id.* at 743–44. "Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.' " *Cueva v. State,* 339 S.W.3d 839, 858–59 (Tex.App.-Corpus Christi 2011, pet. ref'd).

#### B. Discussion
Elizondo argues that the jury charge on self defense was erroneous because it: (1) included a provocation instruction over Elizondo's objection; (2) did not include all of the presumptions of reasonable force as provided by section 9.32 of the penal code; (3) improperly stated the provocation instruction; (4) failed to include an instruction on "threats as justifiable force"; and (5) failed to include any reference to multiple assailants. We address each point in turn.

#### 1. Provocation Instruction
Elizondo asserts that the trial court committed error when it included a provocation instruction to the jury over his objection. In *Matthews v. State,* the Texas Court of Criminal Appeals held that a provocation charge is proper when: (1) self defense is an issue; (2) there are facts in evidence which show that the deceased made the first attack on the defendant; and (3) the defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have a pretext for inflicting injury upon the deceased. 708 S.W.2d 835, 837–38 (Tex.Crim.App.1986). The determination to include the instruction "is limited to whether there is any evidence raising the issue." *Id.* at 838. "Words alone may provoke the difficulty, thereby justifying a provocation charge." *Id.* (citing *Morrison v. State,* 256 S.W.2d 410 (Tex.Crim.App.1953)).

Here, there was some evidence to show that Elizondo provoked the fight. Rigo testified that Elizondo told Junior, "Don't disrespect my woman, you son of a bitch" and "Well, son of a bitch, are you going to calm down or not?" Junior stated that Elizondo called him a "*pendejo* " or "dumbass." Then, both Rigo and Junior testified that Elizondo swung, hitting Limon, Sr. These words and actions constituted "some" evidence that Elizondo provoked the first difficulty.

**\*8** As noted earlier, however, the provocation doctrine is limited if the defendant abandoned the difficulty. *See Smith,* 965 S.W.2d at 513 n. 1 (citing TEX. PENAL CODE ANN. § 9.31(b)(4)). Elizondo argues he "abandoned" the encounter by running from the difficulty outside the bar to his pickup truck, nearly seventy yards away. Therefore, he contends that the provocation instruction was improper. To achieve the abandonment caveat to the provocation doctrine, though, it is "necessary that the intention to abandon the difficulty be, in some manner, communicated by the appellant so as 'to advise his adversary that his danger has passed, and make his conduct thereafter the pursuit of vengeance rather than measures to repel the original assault.' " *Ervin v. State,* 367 S.W.2d 680, 684 (Tex.Crim.App.1963); *see also* TEX. PENAL CODE ANN. § 9.31(b)(4) (providing that abandonment must be "clearly communicated"). Further, "the abandonment of the difficulty by the defendant does not arise where the difficulty was continuous, the only change being in the position of the parties during the progress of the encounter." *Ervin,* 367 S.W.2d at 683–84 (citing *Campbell v. State,* 84 Tex.Crim. 89, 91, 206 S.W. 348 (1918)).

While it is undisputed by all of the witnesses that Elizondo ran nearly seventy yards away from the first difficulty, Junior testified that Elizondo was yelling, "*Van a ver,*" roughly translated as "You will see," while running. Junior testified that he believed that Elizondo's words constituted a threat to the others, which made Junior scared. These words did not communicate to Junior that the danger had passed. *See id.* at 684. Further, the jury was presented with Elizondo's statement to the police which provided that he "ran towards [his] truck where [he] had [his] duty issued H & K 40 Caliber handgun." This evidence supports a rational inference that Elizondo was running to his truck for a weapon, not to escape the fight. *See id.* at 683–84 (providing that one does not abandon a difficulty by merely changing positions). Accordingly, we find that a reasonable jury could have surmised that Elizondo did not abandon the first encounter, and that the provocation instruction was therefore merited.

We conclude that the trial court did not err when it submitted the provocation instruction to the jury because there was sufficient evidence to raise this issue. *Matthews,* 708 S.W.2d at 838. Because we have found no error, no harm analysis is required. *Ngo,* 175 S.W.3d at 743. We overrule this issue.

**2. Presumptions of Reasonable Force**

Elizondo also argues that the trial court erred when it failed to include all of the presumptions of reasonable force as provided by section 9.32 of the penal code. TEX. PENAL CODE ANN. § 9.32. The jury charge only provided that a presumption of reasonableness would arise if Elizondo "knew or had reason to believe that the person against [whom] deadly force was used was committing or attempting to commit murder." *Id.* § 9.32(b)(1)(C). Elizondo argues that two additional scenarios should have been added to the charge. First, where the actor knew or had reason to believe an assailant "unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1)(A). And second, where the actor "(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment." *Id.* § 9.32(b)(1)(B).

**\*9** Elizondo complains that he knew or had reason to believe that Junior unlawfully and with force pulled him out of his pickup truck, or was attempting to do so. He stated that Junior's banging on Elizondo's driver's side window yelling "Get off asshole" meant that he was entitled to those instructions.

We agree that the evidence in the record warranted the inclusion of these instructions. Accordingly, we hold that the trial court erred by omitting them. Having found error, though, we do not find any egregious harm.[2] *Ngo,* 175 S.W.3d at 743–44. Because we previously concluded that a reasonable jury could have found that Elizondo was not entitled to a self-defense argument because he provoked the initial difficulty and did not abandon the encounter, *see section III(B)(1) supra,* these extra instructions would not have affected the outcome. *See* TEX.R.APP. P. 44.2. We overrule this issue.

**3. Improper Provocation Instruction**

Elizondo also argued that the provocation instruction changed the State's burden of proof by instructing the jury to find Elizondo guilty of murder if he provoked the difficulty. The charge provided as follows:

> So, in this case, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jose Guadalupe Rodriguez Elizondo, immediately before the difficulty, then and there did some act, or used some language, or did both, as the

case may be, with the intent on his, the defendant's part to produce the occasion for killing the deceased, Fermin Limon, and to bring on the difficulty with the said deceased, and that such words and conduct on the defendant's part, if there were such, were reasonably calculated to, and did, provoke the difficulty, and that on such account the deceased attacked the defendant with deadly force, or reasonably appeared to defendant to so attack him or to be attempting to attack him, and that the defendant then killed the said Fermin Limon by use of deadly force, to wit, by shooting him with a firearm, in pursuance of his original design, if you find there was such design, *then you will find the defendant guilty of murder.*

(Emphasis added). At trial, Elizondo argued that "the jury should have been instructed, however, that if it found provocation, it should reject self-defense." We agree and hold that this instruction was erroneous.

Having found error, we turn to a harm analysis. *Almanza,* 686 S.W.2d at 171. To determine if Elizondo suffered some harm by this incorrect instruction, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* Upon a thorough review of the trial record and jury charge, though, we find no harm. From voir dire to closing arguments, the jury was repeatedly instructed that it was the State's burden to prove that Elizondo committed murder. The jury charge reinforced this tenet. In light of the foregoing, we hold that the error was harmless and overrule this issue.

### 4. Instruction on "Threats as Justifiable Force"

 **\*10** Elizondo also argues that it was error to fail to include an instruction on "threats as justifiable force." Texas Penal Code section 9.04 provides that:

the threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious

bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

TEX. PENAL CODE ANN. § 9.04. It is undisputed, however, that Elizondo did not request this instruction. In *Posey v. State,* the Texas Court of Criminal Appeals held as follows:

Article 36.14 [of the Texas Code of Criminal Procedure] ... mandates that a trial court submit a charge setting forth the law "applicable to the case." The question in this case is whether this imposes a duty on trial courts to *sua sponte* instruct the jury on unrequested defensive issues. We hold Article 36.14 imposes no such duty.

966 S.W.2d 57, 62 (Tex.Crim.App.1998). "Though the evidence might raise a defensive issue, it does not necessarily follow that a trial court has a duty to *sua sponte* instruct the jury on that issue when the defendant does not request such an instruction." *Id.* Elizondo failed to make this request, so we overrule this issue.

### 5. Failure to Include a Multiple Assailant Instruction

Finally, Elizondo asserts that the trial court erred when it failed to include a multiple assailant instruction in the jury charge. The Texas Court of Criminal Appeals "has held that a charge which is confined only to the right of self-defense against the deceased is too restrictive if there is evidence that more than one person attacked the defendant." *Frank v. State,* 688 S.W.2d 863, 868 (Tex.Crim.App.1985) (citing *Sanders v. State,* 632 S.W.2d 346 (Tex.Crim.App.1982)). "Accordingly, a defendant is entitled to a charge on the right of self-defense against multiple assailants if there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant." *Id.* (internal quotations omitted).

Again, however, Elizondo did not ask for this instruction. Although the evidence at trial raised this issue, with various witnesses testifying that Elizondo and his brother Juan fought with at least three Punto 3 employees, the trial court did not have a *sua sponte* duty to include a multiple assailant

instruction when it was not requested. *See Posey,* 966 S.W.2d at 62. We overrule this issue.

Having overruled all of Elizondo's issues, we affirm the trial court's judgment.

### IV. CONCLUSION

Footnotes

1      Literal translation: "you all will see."

2      Elizondo's counsel failed to object to the omissions in this instruction.

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.